Sophia M. Rios (SBN 305801)
**BERGER MONTAGUE PC**
8241 La Mesa Blvd, Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
Fax: (612) 584-4470
srios@bergermontague.com

*Counsel for Plaintiffs*

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF CALIFORNIA**
**SAN JOSE DIVISION**

| | |
|---|---|
| JANE DOE, SOUTH CAROLINA ROE, NEW JERSEY DOE, and OHIO DOE, on behalf of themselves and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>X.AI CORP. and X.AI LLC,<br><br>Defendants. | CASE NO.:  5:26-cv-00772-PCP<br><br>**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)**<br><br>Date: July 30, 2026<br>Time:10:00 a.m.<br>Courtroom: 8, 4th Floor<br>Judge: Hon. P. Casey Pitts |

# **TABLE OF CONTENTS**

INTRODUCTION ........................................................................................................... 1

STATEMENT OF THE ISSUES .................................................................................... 2

RELEVANT FACTS ...................................................................................................... 2

LEGAL STANDARD ..................................................................................................... 4

ARGUMENT .................................................................................................................. 5

    I.   X.AI Does Not Meet Its Burden to Show an Enforceable Contract Exists. ....... 5

        A.   X.AI Fails to Show Plaintiffs Agreed to the Terms when Creating an Account. ..... 6

        B.   X.AI Does Not Show Plaintiffs Unambiguously Consented to the Revised Terms. ..... 8

    II.   X.AI Is Not Within the Scope of the Contract. ................................................. 9

        A.   Version 20 of the Terms Apply to Plaintiffs' Disputes. ............................ 10

        B.   X.AI Is Not an Intended Beneficiary Under Version 21 of the Terms. ..... 11

    III.   Enforcement of the X Venue Selection Clause Would Be Unreasonable and Unjust Because It Contravenes Strong California Public Policy. ..... 13

        A.   The X Terms Are Unconscionable Under California Law. ........................ 14

        B.   The Venue Selection Clause Waives Non-Waivable Rights under California Law. ..... 18

    IV.   The Public Interest Demands Invalidation of the Venue-Selection Clause. ..... 19

    V.   South Carolina Roe's Claims Should Not Be Transferred. ............................. 22

CONCLUSION ............................................................................................................. 25

# TABLE OF AUTHORITIES

<u>Cases</u>                                                                                          Page(s)

*Adams v. AT&T Mobility, LLC*,
   524 F. App'x 322 (9th Cir. 2013) ...................................................................................11

*Armendariz v. Foundation Health Psychcare Servs., Inc.*,
   24 Cal.4th 83 (2000) ...............................................................................................14, 16, 18

*AT&T Mobility LLC v. Concepcion*,
   563 U.S. 333 (2011)...........................................................................................................17

*Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*,
   571 U.S. 49 (2013)......................................................................................................passim

*Bayol v. Zipcar, Inc.*,
   2014 WL 4793935 (N.D. Cal. Sept. 25, 2014) ...............................................................19

*Berman v. Freedom Fin. Network, LLC*,
   30 F.4th 849 (9th Cir. 2022) ......................................................................................passim

*Bragg v. Linden Rsch., Inc.*,
   487 F. Supp. 2d 593 (E.D. Pa. 2007) ...............................................................................16

*Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*,
   622 F.3d 996 (9th Cir. 2010) ............................................................................................18

*Bristol–Myers Squibb Co. v. Goldston*,
   957 S.W.2d 671 (Tex. App.–Fort Worth 1997, pet. denied) ...........................................17

*Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*,
   582 U.S. 255 (2017)...........................................................................................................22

*Bromlow v. D & M Carriers, LLC*,
   438 F. Supp. 3d 1021 (N.D. Cal. 2020) ...........................................................................25

*Carijano v. Occidental Petroleum Corp.*,
   643 F.3d 1216 (9th Cir. 2011) ..........................................................................................21

*Castagnola v. Hewlett–Packard Co.*,
   2012 WL 2159385 (N.D. Cal. June 13, 2012).................................................................19

*Chabolla v. ClassPass Inc.*,
   129 F.4th 1147 (9th Cir. 2025) ........................................................................................7, 8

*Comb v. PayPal, Inc.*,
   218 F. Supp. 2d 1165 (N.D. Cal. 2002) ..................................................................14, 15, 17

*Comer v. Micor, Inc.*,
436 F.3d 1098 (9th Cir. 2006) ................................................................................10

*Contratto v. Ethicon, Inc.*,
227 F.R.D. 304 (N.D. Cal. 2005).............................................................................7

*Cung Le v. Zuffa, LLC*,
108 F. Supp. 3d 768 (N.D. Cal. 2015) ....................................................................25

*Dawson v. Target Corp.*,
2025 WL 1651940 (N.D. Cal. June 11, 2025) ..........................................................6

*DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*,
28 F.4th 956 (9th Cir. 2022) ..............................................................................4, 13

*Discover Bank v. Superior Ct.*,
36 Cal. 4th 148 (2005) ..........................................................................................17

*Doe v. Epic Games, Inc.*,
435 F. Supp. 3d 1024 (N.D. Cal. 2020) ............................................................23, 24

*Doe v. X Corp.*,
2025 WL 3500543 (N.D. Cal. Nov. 6, 2025) ....................................................7, 9, 10

*Douglas v. U.S. Dist. Court for Cent. Dist. of California*,
495 F.3d 1062 (9th Cir. 2007) .................................................................................8

*Eliza Labs, Inc. v. X Corp.*,
2025 WL 3003766 (N.D. Cal. Oct. 27, 2025)....................................................7, 10, 13

*Figueroa v. Delta Galil USA, Inc.*,
2021 WL 1055197 (N.D. Cal. Feb. 16, 2021) .........................................................11

*Fleming v. Matco Tools Corp.*,
384 F. Supp. 3d 1124 (N.D. Cal. 2019) ..................................................................20

*Gemini Techs., Inc. v. Smith & Wesson Corp.*,
931 F.3d 911 (9th Cir. 2019) ............................................................................20, 21

*Ghazizadeh v. Coursera, Inc.*,
737 F. Supp. 3d 911 (N.D. Cal. 2024) ...................................................................6, 9

*Godun v. JustAnswer LLC*,
135 F.4th 699 (9th Cir. 2025) .........................................................................6, 7, 8

*Heckman v. Live Nation Ent., Inc.,*
*(*"Heckman I"), 686 F. Supp. 3d 939 (C.D. Cal. 2023) ............................................16

*Heckman v. Live Nation Ent., Inc.*,
120 F.4th 670 (9th Cir. 2024) ..........................................................................14, 15, 16

-iii-

*Hernandez v. Wells Fargo & Co.*,
2019 WL 3017657 (N.D. Cal. July 10, 2019)................................................................3

*Holland Am. Line Inc. v. Wartsila N. Am., Inc.*,
485 F.3d 450 (9th Cir. 2007) ........................................................................................13

*In re Bennett*,
298 F.3d 1059 (9th Cir. 2002) ......................................................................................10

*In re Facebook Biometric Info. Priv. Litig.*,
185 F. Supp. 3d 1155 (N.D. Cal. 2016) .........................................................................9

*In re Juul Labs, Inc., Antitrust Litig.*,
2022 WL 137627 (N.D. Cal. Jan. 14, 2022) ..................................................................7

*In re Rigney Constr. & Dev., LLC*,
2018 WL 719515 (Tex. App. Feb. 6, 2018)...................................................................17

*In re Tobacco Cases I*,
186 Cal. App. 4th 42 (2010) ...................................................................................11, 12

*In re: Howmedica Osteonics Corp*,
867 F.3d 390 (3d Cir. 2017)....................................................................................22, 24

*Jackson v. Tesla, Inc.*,
772 F. Supp. 3d 1111 (N.D. Cal. 2025) ..................................................................21, 23

*Jialu Wu v. iTalk Glob. Commc'ns, Inc.*,
2020 WL 8461696 (C.D. Cal. Oct. 21, 2020)...............................................................19

*Jones v. GNC Franchising, Inc.*,
211 F.3d 495 (9th Cir. 2000) ..........................................................................................5

*Keebaugh v. Warner Bros. Ent. Inc.*,
100 F.4th 1005 (9th Cir. 2024) .......................................................................................6

*Klamath Water Users Protective Ass'n v. Patterson*,
204 F.3d 1206 (9th Cir. 1999) ......................................................................................10

*Kramer v. Coinbase, Inc.*,
105 Cal. App. 5th 741 (2025) .......................................................................................19

*Lee v. Fisher*,
70 F.4th 1129 (9th Cir. 2023) .........................................................................................5

*Lentini v. Kelly Servs., Inc.*,
2017 WL 4354910 (N.D. Cal. Oct. 2, 2017).................................................................13

*Little v. Auto Stiegler, Inc.*,
29 Cal.4th 1064 (2003) .................................................................................................15

*M/S Bremen v. Zapata Off-Shore Co.*,
   407 U.S. 1 (1972)............................................................................................4, 13

*MacClelland v. Cellco P'ship,*
   609 F. Supp. 3d 1024 (N.D. Cal. 2022) ...........................................................18

*Manetti-Farrow, Inc. v. Gucci Am., Inc.*,
   858 F.2d 509 (9th Cir. 1988) .......................................................................4, 13

*McGill v. Citibank, N.A.*,
   393 P.3d 85 (Cal. 5th 2017) ..............................................................18, 19, 21

*Murphy v. DirecTV, Inc.*,
   724 F.3d 1218 (9th Cir. 2013) ...........................................................................12

*Nagrampa v. MailCoups, Inc.*,
   469 F.3d 1257 (9th Cir. 2006) ...........................................................................14

*Net Global Mktg. v. Dialtone, Inc.*,
   217 Fed. Appx. 598 (9th Cir. 2007)....................................................................15

*Nguyen v. Barnes & Noble, Inc.*,
   763 F.3d 1171 (9th Cir. 2014) .............................................................................5

*Noriesta v. Konica Minolta Bus. Sols. U.S.A., Inc.*,
   2019 WL 6482222 (C.D. Cal. July 8, 2019)..............................................20, 23

*Oberstein v. Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) ...............................................................................6

*Perry v. AT & T Mobility LLC*,
   2011 WL 4080625 (N.D. Cal. Sept. 12, 2011) ..................................................19

*Phoong L. Corp. v. Primary Wave Media, LLC*,
   2025 WL 2087557 (C.D. Cal. June 6, 2025) ...............................20, 22, 24

*Roling v. E\*Trade Sec., LLC*,
   756 F. Supp. 2d 1179 (N.D. Cal. 2010) ...........................................................20

*Saeedy v. Microsoft Corp.*,
   757 F. Supp. 3d 1172 (W.D. Wash. 2024).........................................................6

*Sandquist v. Lebo Auto., Inc.*,
   376 P.3d 506 (Cal. 5th 2016)......................................................................11, 12

*Schertzer v. Bank of Am., NA*,
   109 F. 4th 1200 (9th Cir. 2024) .........................................................................10

*Snow v. Eventbrite, Inc.*,
   2020 WL 6135990 (N.D. Cal. Oct. 19, 2020)....................................................6

-v-

*South Shore ER, LLC v. Bashiri*,
  2026 WL 1707588 (Tex. Bus. Ct. June 11, 2026) ...................................................17

*St. Clair v. X.AI Holdings Corp.*,
  2026 WL 1803744 (S.D.N.Y. June 23, 2026) ............................................7, 10, 12, 19

*Stangvik v. Shiley*,
  54 Cal.3d 744 (1991) .............................................................................................21

*Steven v. Fid. & Cas. Co. of New York*,
  377 P.2d 284 (Cal. 2d 1962) ..................................................................................12

*Stover v. Experian Holdings, Inc.*,
  978 F.3d 1082 (9th Cir. 2020) ........................................................................5, 8, 9

*Sun v. Advanced China Healthcare, Inc.*,
  901 F.3d 1081 (9th Cir. 2018) ..................................................................................5

*Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*,
  971 F.2d 401 (9th Cir. 1992) ..................................................................................12

*Trupia v. X Corp.*,
  2026 WL 381823 (N.D. Cal. Feb. 11, 2026) ..........................................................7, 10

*Verdugo v. Alliantgroup*,
  237 Cal. App. 4th 141 (2015) ..................................................................................18

*Wacker v. Hammerking Prods. Inc.*,
  608 F. Supp. 3d 947 (C.D. Cal. 2022) .....................................................................11

Statutes, Rules & Regulations

28 U.S.C. § 1391...................................................................................................23
28 U.S.C. § 1391(b) ........................................................................................20, 24
28 U.S.C. § 1404(a) .............................................................................5, 22, 24, 25
Cal. Civ. Code § 1638............................................................................................10
Cal. Civil Code § 1670.5(a) .............................................................................14, 18
Tex. Bus. & Com. Code § 17.50............................................................................19

-vi-

## **INTRODUCTION**

Plaintiffs sued Defendants X.AI Corp. and X.AI LLC ("X.AI") in California, where both entities are headquartered and where the AI model that is the subject of this case was developed and is operated. This case is about how X.AI released an AI model that lacked basic safety features, enabling it to create sexualized, revealing, and humiliating images of Plaintiffs (Jane) South Carolina Doe, Ohio Doe, New Jersey Doe, and South Carolina Roe and thousands of others. X.AI distributed its model, named Grok, from California through Grok.com, the Grok app, X, Telegram, and by licensing the technology to third parties. Despite this widespread distribution and resulting harm, X.AI seeks to benefit from Plaintiffs' purported agreement with X Corp. ("X") to transfer this case to the Northern District of Texas, which has no relation to X.AI, Plaintiffs, or even X. However, X.AI does not meet its burden to show that this case should be transferred.

*First*, X.AI fails to show that any Plaintiff agreed to the X Terms of Service ("X Terms" or "Terms"), which contain the venue-selection clause it seeks to enforce. The declaration X.AI relies on to show contract formation is conclusory and lacks evidence that X provided reasonably conspicuous notice of the Terms when Plaintiffs originally signed up, or that Plaintiffs manifested unambiguous assent to the original Terms or Version 21 which X.AI seeks to enforce. Without this evidence, Ninth Circuit precedent bars enforcement of the purported contract.

*Second*, even if Plaintiffs are bound by the X Terms, their claims fall outside its scope. Version 20 of the Terms, which does not include "corporate affiliates" as beneficiaries of the venue-selection clause, was in effect at the time Plaintiffs' disputes arose. Even under Version 21 of the Terms, "corporate affiliates" is defined narrowly to include only companies *owned* by X, not sibling corporations like X.AI.

*Third*, enforcement would be unreasonable and unjust because it would contravene California public policy barring unconscionable contact terms and the waiver of unwaivable rights. The X Terms are an adhesion contract and multiple provisions act with the venue-selection clause to unfairly disadvantage consumers. The X Terms were revised just a week or two after Plaintiffs were harmed, adding provisions that purport to enable X's "corporate affiliates" to retroactively apply a one-way venue-selection clause requiring consumers (but not X) to file any disputes in Tarrant County,

Texas—where the venue-selection clause is not even enforceable and neither X nor X.AI has any presence. The venue-selection clause and the related provisions should be severed, or the Court should decline to enforce the Terms. The Terms are also void because they violate California's strong public policy of allowing consumers to pursue public injunctive relief against California companies.

*Fourth*, even if the X Terms apply and are enforceable here, the Section 1404 public interest factors weigh strongly in favor of the Court refusing to transfer the case.

*Fifth*, even if some Plaintiffs' claims are transferred, X.AI does not assert that South Carolina Roe is bound by the X Terms. There is no dispute that South Carolina Roe could not have sued X.AI in the Northern District of Texas. Thus, no matter how the Court rules for other Plaintiffs, South Carolina Roe's claims must be severed and she should be allowed to proceed in this District.

The Court should deny the Motion.

## STATEMENT OF THE ISSUES

1.    Whether X.AI has shown that any Plaintiff is bound by the X Terms.

2.    If any Plaintiff is bound by the X Terms, whether their claims are within the scope of the version of the Terms to which they agreed.

3.    Whether the X Terms' venue-selection clause contravenes California public policy such that enforcement would be unreasonable and unjust.

4.    Whether the venue-selection clause is enforceable under § 1404(a).

5.    If some of Plaintiffs' claims are transferred, whether South Carolina Roe's claims should be severed.

## RELEVANT FACTS

X.AI owns the generative AI model known as Grok. (ECF No. 28, Am. Compl. ¶¶ 24, 30-101.) X.AI's corporate headquarters in Palo Alto "houses [X.AI's] advanced AI research, development, and engineering teams and is strategically situated in Silicon Valley . . . . The engineers responsible for the design, training, and continued evolution of Grok, our proprietary frontier AI model, are based at this facility."[1] (*Id.* ¶¶ 22-29.) From California, X.AI purposefully designed Grok

---

[1]Space Exploration Tech. Corp., Form S-1 (2026) at 211, available at:

so that users can generate sexualized and revealing images of others with no meaningful guardrails and without the consent of the people depicted. (*Id.* ¶¶ 22-29, 42-46, 78-101.) The result of X.AI's design, manufacturing, and implementation of Grok was all too predictable: Grok generated and disseminated nonconsensual sexualized, revealing, and humiliating images of thousands of people, including Plaintiffs. (*Id.* ¶¶ 102-54.) While the harms were felt in places like South Carolina, Ohio, and New Jersey, the conduct emanated from California.

On November 14, 2024, X inserted a venue-selection clause into the Terms that purports to force X users to bring disputes in Tarrant County. (Declaration of Megan Scolari ("Scolari Decl."), ECF No. 41-3, ¶¶ 9-11.) The choice of venue is puzzling. X has no apparent operations in Tarrant County and its Texas offices are more than a three-hour drive away. X has offered justification for its selection of venue, leading some to conclude that it is a naked attempt at judge shopping.[2] At the same time, the Terms let X sue consumers in any court with jurisdiction. (Scolari Decl. Ex. 1 at 11.)

X.AI first added image generation to the @grok chatbot for X premium users in December 2024. (Am. Compl. ¶ 51.) With this feature, a user could simply tag @grok in a post prompting it to create or edit an image and @grok would respond by publicly posting the requested image. (*Id.*) X.AI released Grok with no guardrails in place and premium users quickly began using Grok to create and publicly disseminate sexualized or revealing deepfakes with prompts such as "remove her clothes." (*Id.* ¶ 52.) Grok responded with partially nude images. (*Id.*)

X.AI Holdings, the parent of Defendants, acquired X in March 2025. X released Version 21 of the Terms on December 16, 2025 and began notifying users of the revised Terms and obtaining their purported assent with a pop-up that said "Got it" on the same day. (Scolari Decl. ¶ 29.) Version 21 added clauses extending the one-sided venue-selection clause to disputes involving X's "corporate affiliates," which include, according to a link within the Terms, companies that X operates. (*Id.* Ex. 2 at 4, 12; Declaration of Sophia Rios ("Rios Decl."), Ex. A.) Further, despite retaining the express

https://www.sec.gov/Archives/edgar/data/1181412/000162828026036936/spaceexplorationtechnologi.htm. SEC filings are admissions that "may be judicially noticed for the truth of the matter." *Hernandez v. Wells Fargo & Co.*, 2019 WL 3017657, at *5 (N.D. Cal. July 10, 2019).
[2] Toluwani Osibamowo, *Want to sue X?*, Houston Public Media (Nov. 15, 2024), available at: https://www.houstonpublicmedia.org/articles/technology/2024/11/15/506252/want-to-sue-x-youll-have-to-do-it-in-north-texas-according-to-new-terms-of-service/.

-3-

promise that, while X may revise its Terms, "[t]he changes will not be retroactive" (Scolari Decl. Exs. 1 at 11, 2 at 12), Version 21 of the Terms purports to extend application of the venue-selection clause "to pending and future disputes" "regardless of when the conduct relating to the dispute arose or occurred" (*id*. Ex. 2 at 12). Version 21 went into effect on January 15, 2026.

At the same time X was expanding the venue-selection clause to include "corporate affiliates" and apply retroactively to pre-January 15 conduct, X.AI was planning to cause more widespread harm on X by expanding access to Grok's image generation feature on X to all users, again without adding guardrails that would prevent the generation and dissemination of nonconsensual sexualized deepfakes. (Am. Compl. ¶ 53.) Beginning on December 24, 2025, Grok generated and disseminated hundreds of thousands of increasingly explicit images of women and minors stripped down to revealing bikinis or nude in humiliating, sexualized circumstances. (*Id.* ¶¶ 53-54.) Images of South Carolina Doe, Ohio Doe, and New Jersey Doe were published by Grok on X between January 1 and 5, 2026—*after* each had purportedly assented to a retroactive venue-selection clause with X.AI but *before* the January 15 effective date of Version 21 of the Terms.

In its Motion, X.AI seeks to enforce the X Terms to bring this California-based case to Tarrant County based on South Carolina Doe's, Ohio Doe's, and New Jersey Doe's purported agreement to the X Terms. X.AI does not assert that South Carolina Roe is bound by the Terms.

## LEGAL STANDARD

Federal law governs the interpretation and enforcement of forum-selection clauses in diversity cases. *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 513 (9th Cir. 1988). However, the validity of a forum or venue-selection clause, like any other contract clause, is a threshold issue governed by state law. *DePuy Synthes Sales, Inc. v. Howmedica Osteonics Corp.*, 28 F.4th 956, 963-64 (9th Cir. 2022). Questions of contract formation are similarly questions of state law. *Berman v. Freedom Fin. Network, LLC*, 30 F.4th 849, 855 (9th Cir. 2022).

Courts will decline to enforce a valid forum selection clause if a plaintiff "clearly show[s] that enforcement would be unreasonable and unjust." *M/S Bremen v. Zapata Off-Shore Co.*, 407 U.S. 1, 15 (1972). In determining whether enforcement is unreasonable or unjust, courts look to whether enforcement would contravene a strong public policy of the forum in which the suit is brought

-4-

(whether declared by statute or judicial decision), or if enforcement would effectively deprive the plaintiff of her day in court. *Sun v. Advanced China Healthcare, Inc.*, 901 F.3d 1081, 1088 (9th Cir. 2018), *holding modified by Lee v. Fisher*, 70 F.4th 1129 (9th Cir. 2023). If the court finds that enforcement of a valid forum selection clause would be reasonable and just, then the court "may consider arguments about [the 28 U.S.C. § 1404(a)] public-interest factors only." *Atl. Marine Constr. Co. v. U.S. Dist. Ct. for W. Dist. of Tex.*, 571 U.S. 49, 64 (2013). While the existence of a forum selection clause is a "significant factor" in a court's analysis, it is not a "dispositive" factor because the public interests may outweigh the existence of a forum selection clause. *Jones v. GNC Franchising, Inc.*, 211 F.3d 495, 499, 499 n.20 (9th Cir. 2000).

## **ARGUMENT**

X.AI's attempt to transfer this case to the Northern District of Texas, which has no relationship to Plaintiffs or X.AI (or even X), should be rejected on numerous grounds.

### **I.    X.AI Does Not Meet Its Burden to Show an Enforceable Contract Exists.**

X.AI bears the burden of establishing "each element of a valid contract—including mutual assent." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020). X.AI seeks to enforce Version 21 of the X Terms, which went into effect January 15, 2026, under the theory that Plaintiffs manifested assent to Version 21 by continuing to use X. However, X.AI fails to meet its burden to show that any agreement between Plaintiffs and X was formed such that Plaintiffs also agreed to X's unilateral revisions of that agreement.

In the context of online contracts, courts are generally reluctant to enforce agreements that leave users "unaware that contractual terms were even offered, much less that continued use of the website will be deemed to manifest acceptance of those terms." *Berman*, 30 F.4th at 856 (citing *Nguyen v. Barnes & Noble, Inc.*, 763 F.3d 1171, 1178 (9th Cir. 2014)). Thus, under California law, online agreements may be an enforceable contract based on inquiry notice if "(1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Id.* Courts analyze these factors by conducting a fact-intensive inquiry under an objective reasonableness standard. *See id.* at 856–58 (conducting a fact-

intensive inquiry to determine whether agreement met an objective standard of mutual assent); *Saeedy v. Microsoft Corp.*, 757 F. Supp. 3d 1172, 1189 (W.D. Wash. 2024) ("The assessment of sign-in wrap and other types of online agreements entails a fact-intensive inquiry.") (*citing Oberstein v. Live Nation Ent., Inc.*, 60 F.4th 505, 513-15 (9th Cir. 2023)).

### A.    X.AI Fails to Show Plaintiffs Agreed to the Terms when Creating an Account.

X.AI completely fails to meet its burden to show that, when Plaintiffs created their accounts X (or its predecessor, Twitter), X provided reasonably conspicuous notice of the Terms and obtained Plaintiffs' unambiguous assent. The "evidence" X.AI relies upon is the bald assertion of Megan Scolari, X Corp.'s Legal Program Manager, that Plaintiffs viewed one of two sign up screens when signing up for the service. One that read "'[b]y signing up, you agree to the Terms of Service'" and one that read "'[b]y clicking on 'Create my account' below, you are agreeing to the Terms of Service above.'" (Scolari Decl. ¶ 8.) Ms. Scolari further asserts that "Plaintiffs each necessarily clicked on the 'Create my account' button when creating their X accounts." (*Id.*)

To assess reasonably conspicuous notice, the Court must consider the textual notice of the Terms in the context of the "overall design of the webpage." *See*, *e.g.*, *Godun v. JustAnswer LLC*, 135 F.4th 699, 709-10 (9th Cir. 2025) (analyzing reasonable conspicuousness "is necessarily a visual and aesthetic analysis" and "'even minor differences' in the design elements may make the difference in this fact-intensive analysis"); *Keebaugh v. Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1019 (9th Cir. 2024); *Berman*, 30 F.4th at 857. To meet its burden, X.AI must "demonstrate what versions of the sign-in wrap agreements the plaintiffs would have seen during the relevant time period." *Snow v. Eventbrite, Inc.*, 2020 WL 6135990, at *5 (N.D. Cal. Oct. 19, 2020). But X.AI does not provide an image of either of the two sign-up screens, nor does it specify which Plaintiffs viewed which screen. Without this evidence, the Court cannot conclude that any Plaintiff had reasonably conspicuous notice of the Terms when signing up and should deny X.AI's Motion on these grounds. *See*, *e.g.*, *id.* (denying motion to compel arbitration because defendant did not show which screens plaintiffs saw); *Ghazizadeh v. Coursera, Inc.*, 737 F. Supp. 3d 911, 934 (N.D. Cal. 2024) ("Without an image of what the 2021 Banner Notice looks like, the Court is not able conclude whether it provided sufficiently conspicuous notice, and Coursera has not met its burden as to that notice."); *Dawson v. Target Corp.*,

-6-

2025 WL 1651940, at *2 (N.D. Cal. June 11, 2025) (denying motion to compel arbitration because defendant could not show the screenflow at the time of account creation); *In re Juul Labs, Inc., Antitrust Litig.*, 2022 WL 137627, at *1 (N.D. Cal. Jan. 14, 2022) (denying motion to compel arbitration because defendant did not show the screenflow at the time of account creation).[3]

To satisfy the second element of contract formation, there must be an unambiguous manifestation of assent. The click of a button "can be construed as an unambiguous manifestation of assent only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *Berman*, 30 F.4th at 857 (citation omitted). *See also Godun*, 135 F.4th at 713 ("mandating explicit advisement in advisal language").

The textual advisals identified in the Scolari Declaration do not meet this standard. The advisal stated "[b]y signing up, you agree to the Terms of Service." (Scolari Decl. ¶ 8.) However, there was no "sign up" button to unambiguously indicate Plaintiffs' assent. Instead, Plaintiffs were presented with a "Create my account" button. (*Id.*) The Ninth Circuit's decision in *Chabolla v. ClassPass Inc.*, 129 F.4th 1147, 1154 (9th Cir. 2025) is directly on point. The court in *Chabolla* emphasized that the legal significance of an action must be explained unambiguously. There, an advisal read "[b]y signing up you agree . . . ." *Id.* at 1158. Because the action button read "Continue" rather than "Sign up," the court concluded that there was no unambiguous manifestation of assent. *Id.* X.AI has therefore failed to show that any Plaintiff unambiguously consented to the Terms.

None of X.AI's cited cases involving the X Terms demand a different conclusion. (Motion at 14.) Plaintiffs in those cases did not dispute that a contract had been formed during the account creation process and one actually relied on the X Terms in their complaint. *See Trupia v. X Corp.*, 2026 WL 381823, at *1 (N.D. Cal. Feb. 11, 2026); *Doe v. X Corp.*, 2025 WL 3500543, at *6 (N.D. Cal. Nov. 6, 2025); *Eliza Labs, Inc. v. X Corp.*, 2025 WL 3003766, at *4 (N.D. Cal. Oct. 27, 2025) (relying on X terms); *see also St. Clair v. X.AI Holdings Corp.*, 2026 WL 1803744, at *2 (S.D.N.Y. June 23, 2026) (plaintiff conceded she was bound by Version 20 of the Terms). In any event, X.AI is

---

[3] If X.AI attempts to introduce new evidence as to Plaintiffs in its reply brief, Plaintiffs would be deprived of the opportunity to respond and the Court should decline to consider it. *See Contratto v. Ethicon, Inc.*, 227 F.R.D. 304, 308 n.5 (N.D. Cal. 2005) (striking new evidence in witness declaration as improper reply evidence).

not relieved of the burden of showing Plaintiffs are bound by the Terms. X.AI does not come close to meeting its burden.

### B.    X.AI Does Not Show Plaintiffs Unambiguously Consented to the Revised Terms.

The Ninth Circuit rejects the view that "mere inquiry notice of changed terms is enough to bind the parties to them." *Stover v. Experian Holdings, Inc.*, 978 F.3d 1082, 1086 (9th Cir. 2020). Instead, modifications to an existing contract require the same "assent" for a revision that the existing contract required. *Id.*; *Douglas v. U.S. Dist. Court for Cent. Dist. of California*, 495 F.3d 1062, 1066 (9th Cir. 2007). "The conduct of a party," such as continued use of a product, "is not effective as a manifestation of his assent unless he intends to engage in the conduct and knows or has reason to know that the other party may infer from his conduct that he assents." *Berman*, 30 F.4th at 855.

Here, in connection to Versions 20 and 21 of the Terms, X deployed pop-ups stating that X was updating the Terms of Service and Privacy Policy with a "Got it" button at the bottom. (Scolari Decl. ¶¶ 20, 29.) The text of the pop-ups fail to "explicitly advise[] that the act of clicking will constitute assent to the terms." *Berman*, 30 F.4th at 857; *Chabolla*, 129 F.4th at 1154; *Godun*, 135 F.4th at 713. Nor did the pop ups advise that continuing to use the service would constitute assent to the revised terms or, for Version 21, that the revised terms would act retroactively. Thus, the pop-ups, standing alone, are insufficient to bind Plaintiffs to the revised Terms.[4]

To show unambiguous consent, X.AI instead relies on the "continuing use" provision in the Terms Plaintiffs purportedly agreed to when signing up for the service. The Ninth Circuit has found continued use of a service can constitute unambiguous assent to revised terms where there is notice of the revised terms and "a change-of-terms provision in the original contract." *Stover*, 978 F.3d at 1084. Such a provision states that the consumer "would be bound to future versions of the contract

---

[4] To the extent that X.AI relies on the statements at the bottom of two Privacy Center posts, any advisals in those posts were not reasonably conspicuous and insufficient to obtain unambiguous assent as they were only visible after clicking a mundane "Privacy Center" link in the pop-ups and reading through a page of text, and were not sufficiently prominent on the screen or in proximity to the "Got it" button. (*See* Scolari Decl. ¶¶ 22, 31.) *See Berman*, 30 F.4th at, 858 (holding plaintiffs did not unambiguously consent where textual advisals were not "in proximity" to the buttons plaintiffs clicked to purportedly indicate assent). The news articles attached to the Scolari Declaration suffer from the same deficiencies for notice and assent purposes.

-8-

by continuing to access" the product after a revision. *Id.*; *see also Ghazizadeh*, 737 F. Supp. 3d at 933-34 ("Plaintiff's consent to the 2015 TOU, which contained a 'continuing use' provision, combined with Plaintiff's continued use of Coursera's services, is sufficient to demonstrate manifestation of consent to the updated terms"); *X Corp.*, 2025 WL 3500543, at *6 ("according to the explicit terms of the contract Plaintiff agreed to, continued use of the platform manifested his assent to the Terms of Service as they were revised"); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016) (binding plaintiffs to updated terms of agreement based on continued use where they "initially accepted the user agreement" and they "were given adequate notice of the terms in the [updated] user agreement").

X.AI fails to show that the revised terms are enforceable for two reasons. First, as shown above, X.AI has not proven that any of the Plaintiffs initially agreed to the Terms when creating accounts. Second, X.AI contends, without support, that the Terms "that were operative when each of the [] Plaintiffs created their accounts" "stated that they may be revised and that '[b]y continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.'" (Mot. at 6 (citing Scolari Decl. ¶ 36).) X.AI never states which version of the Terms Plaintiffs purportedly accepted at signup and does not provide copies of those Terms. The contention also appears to be untrue. For example, X.AI contends that New Jersey Doe created an account on March 25, 2009. (Scolari Decl. ¶ 7.) According to the Terms of Service archive provided on X.com, Version 1 of the Terms was in effect at that time.[5] Version 1 of the Terms does not contain the "continuing use" provision relied upon by X.AI in its Motion.[6]

X.AI fails to carry its burden to show that either Version 20 or Version 21 of the Terms containing the venue-selection clause are valid and enforceable contracts with any Plaintiff.

## II.    X.AI Is Not Within the Scope of the Contract.

Even if Versions 20 and Version 21 of X Terms are valid and enforceable contracts with each Plaintiff, X.AI's attempt to enforce the venue-selection clause as a third-party beneficiary fails.

---

[5] X, *Previous Terms of Service*, https://x.com/en/tos/previous (last accessed June 26, 2026).

[6] X, Version 1, https://x.com/en/tos/previous/version_1 (last accessed June 26, 2026) (terms in effect until September 9, 2009).

Generally speaking, a party "cannot be bound to the terms of a contract he didn't sign and is not even entitled to enforce." *Comer v. Micor, Inc.*, 436 F.3d 1098, 1102 (9th Cir. 2006). A third-party beneficiary "must fall within a class *clearly* intended by the parties to benefit from the contract." *Klamath Water Users Protective Ass'n v. Patterson*, 204 F.3d 1206, 1211 (9th Cir. 1999) (emphasis added), *opinion amended on denial of reh'g*, 203 F.3d 1175 (9th Cir. 2000).

**A.    Version 20 of the Terms Apply to Plaintiffs' Disputes.**

X.AI's claimed right to transfer this case hinges on Version 21's expansion of the venue-selection clause to "corporate affiliates," which went into effect on January 15, 2026. Both Versions 20 and 21 of the X Terms expressly promise that, while X may revise the Terms, "[t]he ***changes will not be retroactive***." (Scolari Decl. Exs. 1 at 11, 2 at 12 (emphasis added).) Here, Plaintiffs' injuries and related disputes arose between January 1 and 5, 2026. (Am Compl. ¶¶ 114, 119-120, 130-32, 134, 145, 148.) Thus Version 20 of the Terms, effective from November 15, 2024 through January 15, 2026, applies to Plaintiffs' disputes.

"Under California law, the interpretation of a contract is a question of law." *In re Bennett*, 298 F.3d 1059, 1064 (9th Cir. 2002). "The fundamental goal of contract interpretation is to give effect to the mutual intent of the parties as it existed at the time of contracting." *Schertzer v. Bank of Am., NA*, 109 F. 4th 1200, 1208 (9th Cir. 2024) (citation omitted). Where the contract is clear and explicit, the plain language of the contract governs. *See* Cal. Civ. Code § 1638. Plaintiffs are aware of no cases considering the meaning of this clause in the X Terms. *See generally Trupia*, 2026 WL 381823; *X Corp.*, 2025 WL 3500543; *Eliza Labs*, 2025 WL 3003766; *St. Clair*, 2026 WL 1803744.

Retroactive means "extending in scope or effect to a prior time" or "made effective as of a date prior to enactment."[7] The parties therefore clearly and explicitly agreed that changes to the Terms would not be "made effective" before the new Terms went into effect. X.AI is therefore barred from enforcing the language in Version 21 of the Terms that purports to require Plaintiffs to bring any disputes with X's "corporate affiliates" in Tarrant County. While X.AI may attempt to argue that the Terms permit the venue-selection clause to be applied to pending disputes, courts "must give

---

[7] *Retroactive*, Merriam Webster, https://www.merriam-webster.com/dictionary/retroactive (last accessed June 26, 2026).

significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage." *In re Tobacco Cases I*, 186 Cal. App. 4th 42, 49 (2010). Moreover, "ambiguities in written agreements are to be construed against their drafters." *Sandquist v. Lebo Auto., Inc.*, 376 P.3d 506, 514 (Cal. 5th 2016). The clause stating that "[t]he changes will not be retroactive," if ambiguous, should be construed against X and X.AI.

**B.    X.AI Is Not an Intended Beneficiary Under Version 21 of the Terms.**

X.AI faces another fundamental problem: X.AI is not a "corporate affiliate" as defined in Version 21 of the X Terms. Even if Plaintiffs agreed to Version 21 of the Terms (they did not), that agreement was with X, not X.AI. Whether a third party can benefit from a contract turns on the contract's exact language. *Compare Adams v. AT&T Mobility, LLC*, 524 F. App'x 322, 324 (9th Cir. 2013) (finding third-party beneficiary status for corporate parent and successor because clause "redefines the subject pronoun 'we' to include various additional parties, such as assignees, parent companies, successors, subsidiaries, and affiliates") *with Figueroa v. Delta Galil USA, Inc.*, 2021 WL 1055197, at *5 (N.D. Cal. Feb. 16, 2021) (finding lack of third-party beneficiary status where similar language was lacking). This case is outside the scope of the venue-selection clause because courts must apply a contract's definitions "to give full effect to the intent of the parties." *Wacker v. Hammerking Prods. Inc.*, 608 F. Supp. 3d 947, 960 (C.D. Cal. 2022) (applying definition in contract instead of "ordinary plain meaning").

Here, X used a different term for affiliates than it did for its corporate siblings. While the term "affiliate" can include a sibling corporation, that is not how "affiliate" is defined in the X Terms. The X Terms define "X Entities," which include "X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors." (Scolari Decl., Ex. 2 at 10.) Separately, there are "corporate affiliates." The venue-selection clause references the latter.

The term "corporate affiliates" appears at the beginning of the X Terms, outlining what they are and to whom they apply. X explains that the Terms apply to "your access to and use of, and anything relating to . . . our or our corporate affiliates' services." (Scolari Decl., Ex. 2 at 4.) Helpfully, X provides a link that explains just who these corporate affiliates are and what services they provide. (Scolari Decl., Ex. 2 at 4.) Clicking the link, a user sees that X "operate[s] companies that provide

-11-

services under their own separate terms and privacy policies." (Rios Decl., Ex. A.) It lists two such "corporate affiliates": Vine and Twitpic.[8] X.AI is not among them. The most reasonable reading is that corporate affiliates are limited to Vine and Twitpic, not a sibling corporation like X.AI which is part of the "X Entities." The only other case to consider whether X.AI is a "corporate affiliate" under the X Terms did not consider this argument (*see St. Clair*, 2026 WL 1803744, *3), which is supported by several canons of contract interpretation if the Court finds ambiguity in the X terms.

*Expressio unius est exclusio alterius*. Under the expressio unius est exclusio alterius rule of construction, the "mention of one matter implies the exclusion of all others is an aid to resolve the ambiguities of a contract." *Murphy v. DirecTV, Inc.*, 724 F.3d 1218, 1234 (9th Cir. 2013) (cleaned up) (quoting *Steven v. Fid. & Cas. Co. of New York*, 377 P.2d 284, 289 (Cal. 2d 1962)). X knew how to define corporate affiliates in its Terms. It included only two companies owned and operated by X. That limited category of corporate affiliates implies the exclusion of other kinds of corporate affiliates like corporate siblings.

*Rule against surplusage*. Courts "must give significance to every word of a contract, when possible, and avoid an interpretation that renders a word surplusage." *In re Tobacco Cases I*, 186 Cal. App. 4th at 49. If the terms "X Entities" and "corporate affiliates" are interchangeable, then one term or the other is surplusage. These terms must mean different things.

*Contra proferentem*. In interpreting ambiguous contact provisions, "ambiguities in written agreements are to be construed against their drafters." *Sandquist*, 376 P.3d at 514; *Sutter Home Winery, Inc. v. Vintage Selections, Ltd.*, 971 F.2d 401, 407 (9th Cir. 1992). This is especially true in take-it-or-leave it adhesion contracts like the X Terms, where this rule "applies with peculiar force[.]" *Sandquist*, 376 P.3d at 514. In short, X "clearly knew how to provide for a third-party beneficiary if it wished to do so." *Murphy*, 724 F.3d at 1234. Even if the term "corporate affiliates" is ambiguous and could include corporate siblings, X.AI cannot graft new meaning on the X Terms unsupported by

---

[8] Vine was acquired by X, then-Twitter, in 2012. Tom Cheredar, Reuters, *Twitter takes aim at video, acquires video clip service Vine* (Oct. 9, 2012), https://www.reuters.com/article/business/twitter-takes-aim-at-video-acquires-video-clip-service-vine-idUS4286695776/. Twitpic was a service hosted by Twitter. Stephanie Mlot, *Twitter to Support Twitpic Archives After Shutdown*, PC Mag. (Oct. 27, 2014), https://www.pcmag.com/news/twitter-to-support-twitpic-archives-after-shutdown.

-12-

the plain language of the Terms.

X.AI's attempt to benefit from a contract to which it is not an intended beneficiary also fails. (Motion at 23.) Courts enforce forum selection clauses for non-signatory defendants only if the "alleged conduct of the nonparties is closely related to the contractual relationship." *Holland Am. Line Inc. v. Wartsila N. Am., Inc.*, 485 F.3d 450, 456 (9th Cir. 2007). The court in *Eliza Labs, Inc. v. X Corp.* provides an instructive example. 2025 WL 3003766, at *5. There, unlike here, "Plaintiffs' allegations and claims relate directly to Plaintiffs' use of, and suspension from, the X platform[,]" and the X Terms were "central to their claims[.]" *Id*. By contrast, Plaintiffs' claims here relate to X.AI's conduct, not X's conduct. Plaintiffs do not invoke or otherwise rely on the X Terms in their Complaint and the X Terms will not determine the merits of this case, distinguishing this case from the other cases on which X.AI relies. *Lentini v. Kelly Servs., Inc.*, 2017 WL 4354910, at *1, *5 (N.D. Cal. Oct. 2, 2017) (noting that enforcement for non-signatories was appropriate where employment agreement governed employment dispute against parties and non-parties); *Manetti-Farrow, Inc. v. Gucci Am., Inc.*, 858 F.2d 509, 514, 514 n.5 (9th Cir. 1988) (noting that claims "require[d] interpretation of the contract" and that conduct of non-signatories was "closely related to the contractual relationship" at issue). Notably, Plaintiffs allege that X.AI created the images at issue here on a number of platforms. South Carolina Roe, for example, does not allege that the image of her was posted on X at all. (Am. Compl. ¶ 105.) She is not alone either. Grok has its own standalone platform independent of X, and it is integrated into other platforms, including Telegram. (Am. Compl. ¶¶ 59-60.) These images will necessarily be part of this case. The X Terms will not govern how the Court will rule on the merits.

**III.    Enforcement of the X Venue Selection Clause Would Be Unreasonable and Unjust Because It Contravenes Strong California Public Policy.**

"A contractual choice-of-forum clause should be held unenforceable if enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision." *Bremen*, 407 U.S. at 15. A venue-selection clause that violates state law is unenforceable. *DePuy*, 28 F.4th at 963-64 (holding that state law governs the validity of forum-selection clause). Whether one looks to California or Texas law to determine whether the venue-

-13-

selection clause is enforceable, the result is the same. X.AI cannot enforce this clause.

### A.    The X Terms Are Unconscionable Under California Law.

Enforcing the venue-selection clause would contravene California's strong public policy—declared by Cal. Civil Code § 1670.5(a) and the State's judicial decisions—against the enforcement of unconscionable contract provisions. Under California law, unconscionability has both procedural and substantive components. *Comb v. PayPal, Inc.*, 218 F. Supp. 2d 1165, 1172 (N.D. Cal. 2002). The two elements operate on a sliding scale: the more significant one is, the less significant the other need be. *Id.* at 1172; *see Armendariz v. Foundation Health Psychcare Servs., Inc.*, 24 Cal.4th 83, 114 (2000) ("[T]he more substantively oppressive the contract term, the less evidence of procedural unconscionability is required to come to the conclusion that the term is unenforceable, and vice versa."). Unconscionability cannot be determined from the face of the contract alone; it requires an inquiry into the circumstances under which the contract was executed, the contract's purpose, and the contract's effect. *Comb*, 218 F. Supp. 2d at 1172. Here, the X Terms, and particularly the venue-selection clause, are both procedurally and substantively unconscionable.

### i.    The venue-selection clause is procedurally unconscionable.

Procedural unconscionability is shown by oppression through the existence of unequal bargaining positions or surprise through hidden terms common in the context of adhesion contracts. *Comb*, 218 F. Supp. 2d at 1172. The X Terms are procedurally unconscionable for three reasons.

*First*, oppression is present because the Terms are a contract of adhesion presented to Plaintiffs on a take-it-or-leave-it basis without room for negotiation. *Heckman v. Live Nation Ent., Inc.*, 120 F.4th 670, 682 (9th Cir. 2024), *cert. denied*, 146 S. Ct. 96 (2025) (citing *Nagrampa v. MailCoups, Inc.*, 469 F.3d 1257, 1281 (9th Cir. 2006)).[9]

*Second*, surprise is present because the venue-selection clause and the clause purporting to extend the venue-selection clause to X's "corporate affiliates" are hidden in the middle of a paragraph, at the end of a long agreement, and under the unhelpful heading "General." *Heckman*, 120 F.4th at

---

[9] A contract of adhesion, is a "standardized contract, which, imposed and drafted by the party of superior bargaining strength, relegates to the subscribing party only the opportunity to adhere to the contract or reject it." *Comb*, 218 F. Supp. 2d at 1172; *Armendariz*, 24 Cal. 4th at 113.

-14-

682 (surprise "can arise when 'the supposedly agreed-upon terms of the bargain are hidden in a prolix printed form drafted by the party seeking to enforce the disputed terms'"); *Net Global Mktg. v. Dialtone, Inc.*, 217 Fed. Appx. 598, 601 (9th Cir. 2007) (finding procedural unconscionability where "[t]here was no 'clear heading' in the Terms of Service that could refute a claim of surprise; to the contrary, the arbitration clause is listed in the midst of a long section without line breaks under the unhelpful heading of 'Miscellaneous'").

*Third*, surprise and oppression are further present because the venue-selection clause contradicts other provisions in the Terms. At the beginning of the Terms, it states "These Terms are an agreement between you and X Corp., . . . The words 'we,' 'us,' and 'our' mean X Corp." (Scolari Decl. Ex. 2 at 4.) The first sentence of the paragraph containing the venue-selection clause concerns "any dispute that arises between you and us." (*Id.*) Thus users have no reason to suspect that hidden in the middle of the paragraph is an expansion of "disputes" to include X's unnamed corporate affiliates. Further, at the beginning of the General section, both Versions 20 and 21 state that changes to the Terms "will not be retroactive." (Scolari Decl. Exs. 1 at 11, 2 at 12.) Despite this clear directive, which users may have relied on when determining whether to read future versions of the Terms, X.AI seeks to *retroactively* apply Version 21's expansion of the venue-selection clause to corporate affiliates, which only became effective on January 15, 2026, to claims based on conduct that occurred from January 1-5, 2026. (Am. Compl. ¶¶ 114, 119-120, 130-32, 134, 145, 148.) Thus, the Terms are "affirmatively misleading." *Heckman*, 120 F.4th at 683. With multiple elements of procedural unconscionability, the X Terms go well beyond a run-of-the-mill contract-of-adhesion case.

**ii.    The Terms and venue-selection clause are substantively unconscionable.**

"Substantively unconscionable terms may take various forms, but may generally be described as unfairly one-sided." *Little v. Auto Stiegler, Inc.*, 29 Cal.4th 1064, 1071 (2003). The substantive component can be satisfied by showing overly harsh or one-sided results that "shock the conscience." *Comb*, 218 F. Supp. 2d at 1172.

*First*, X retained a unilateral right to modify the agreement and made substantial changes to the Terms after Plaintiffs created their accounts. X (i) switched the choice-of-law provision from California to Texas; (ii) switched the venue-selection clause from San Francisco, California, X's

-15-

former headquarters, to Tarrant County, Texas—where X has no connections; (iii) exempted itself from having to comply with the venue-selection clause; (iv) expanded the venue-selection clause to included unnamed corporate affiliates as beneficiaries right after X.AI's image generation capabilities were released to everyone on X causing widespread harm; and (v) expanded the venue-selection clause to retroactively apply to all disputes arising from X.AI's pre-Version 21 conduct, *after* X.AI had already inflicted that widespread harm.[10] X has unconscionably wielded its unilateral right of modification to craft an asymmetrical agreement insulating a California company from California law and breached its duty of good faith and fair dealing "by adding new, unreasonable terms to be applied retroactively to already accrued claims." *Heckman v. Live Nation Ent., Inc.* ("*Heckman I*"), 686 F. Supp. 3d 939, 955 (C.D. Cal. 2023), *aff'd*, 120 F.4th 670 (9th Cir. 2024). *See also Bragg v. Linden Rsch., Inc*., 487 F. Supp. 2d 593, 608 (E.D. Pa. 2007) (applying California law and finding unilateral right to modify agreement unconscionable).

*Second*, the venue-selection clause that X.AI seeks to enforce lacks any semblance of mutuality. Starting with Version 20 of the Terms, X added a provision stating that "in its sole discretion, X may bring any claim, cause of action, or dispute we have against you in any competent court in the country in which you reside that has jurisdiction and venue over the claim." (Scolari Decl. Ex. 1 at 11.) The Terms give no reason why X may have a choice of venue but its users do not. *See Armendariz*, 24 Cal. 4th at 117 (finding contract "unfairly one-sided" where party with superior bargaining power imposed arbitration on the weaker party but did not accept such limitations itself "without at least some reasonable justification for such one-sidedness"). The imbalance is acute here: Plaintiffs have sued X.AI where it is headquartered and the Court has jurisdiction and venue, but X.AI seeks to move the case to Tarrant County, where no Plaintiff resides and X.AI has no corporate presence, and the court lacks jurisdiction. This provision is therefore substantively unconscionable. *Heckman*, 120 F.4th at 686 ("whether procedures make '[t]he odds ... far more likely' for one side" weighs in favor of finding substantive unconscionability).

*Third*, the venue-selection clause is unlawful because it is unenforceable in Texas, where X.AI

---

[10] *Compare* X Terms, General, Version 19, effective September 29, 2023-November 14, 2024, https://x.com/en/tos/previous/version_19 *with* Scolari Decl. Exs. 1 at 11-12, 2 at 12-13.

seeks to transfer the case. In Texas, "[b]ecause venue is fixed by law, any agreement or contract whereby the parties try to extend or restrict venue is void as against public policy." *Bristol–Myers Squibb Co. v. Goldston*, 957 S.W.2d 671, 674 (Tex. App.–Fort Worth 1997, pet. denied); *see also South Shore ER, LLC v. Bashiri*, 2026 WL 1707588, at *5 (Tex. Bus. Ct. June 11, 2026) (striking down venue-selection clause). A provision that "refers to the county in which suit should be brought, [] is a venue selection clause and not a forum selection clause." *In re Rigney Constr. & Dev., LLC*, 2018 WL 719515, at *5 (Tex. App. Feb. 6, 2018). The clause at issue here specifies suits must be brought in Tarrant County and is a venue-selection clause. (Scolari Decl. Ex. 2 at 12.) The Terms are designed to let X.AI enforce this provision in courts where such a venue-selection clause may be enforced, to transfer the case to a state where the clause is unenforceable. Such unlawful gamesmanship should not be entertained.

*Fourth*, the General section of the Terms contains a class action waiver, effectively insulating X and its corporate siblings such as X.AI from liability for the types of widespread harm alleged in the Complaint that are likely to yield relatively small amounts of damages. This type of waiver has been repeatedly held to be unconscionable under California law. *See Discover Bank v. Superior Ct.*, 36 Cal. 4th 148, 161 (2005) (finding one-sided, exculpatory class action waivers contracts of adhesion "are generally unconscionable" where "they operate to insulate a party from liability that otherwise would be imposed under California law"), *abrogated on other grounds by AT&T Mobility LLC v. Concepcion*, 563 U.S. 333 (2011) (overruling the *Discover Bank* only as it relates to arbitration). While courts in X.AI's home state of California generally decline to enforce class action waivers, the Texas venue-selection clause and Texas choice-of-law provisions force consumers with relatively small claims to travel to Texas and obtain counsel familiar with Texas law to pursue relatively small individual small-dollar amount claims for harms inflicted across the country. *See Comb*, 218 F. Supp. 2d at 1177 (observing unfairness of requiring "individual consumers from throughout the country to travel to one locale to arbitrate claims involving such minimal sums" and finding venue provision unconscionable). Undertaking such burden is infeasible for most consumers. Thus, the clause effectively shields X and X.AI from liability for harms to consumers, and shields X.AI from application of California laws regulating California corporations engaging in conduct that causes

-17-

widespread harm to consumers. The clause is thus unconscionable. *See Bridge Fund Cap. Corp. v. Fastbucks Franchise Corp.*, 622 F.3d 996, 1005 (9th Cir. 2010).

**iii.    The Court Should Refuse to Enforce the Venue-Selection Clause and Related Provisions.**

California law grants trial courts broad leeway to remedy unconscionable contracts: "[T]he court may refuse to enforce the contract, or it may enforce the remainder of the contract without the unconscionable clause, or it may so limit the application of any unconscionable clause as to avoid any unconscionable result." Cal. Civ. Code § 1670.5(a). "The overarching inquiry is whether 'the interests of justice . . . would be furthered' by severance." *Armendariz*, 24 Cal. 4th at 124. "In conducting this [severability] analysis, the court may also consider the deterrent effect of each option." *MacClelland v. Cellco P'ship*, 609 F. Supp. 3d 1024, 1046 (N.D. Cal. 2022).

Here, unconscionability permeates the entire General section of the Terms containing the venue-selection clause X.AI seeks to enforce. The Court should thus sever the General section from the remainder of the Terms. *Armendariz*, 24 Cal. 4th at 124 (if the "illegal provision can be extirpated from the contract by means of severance or restriction, then such severance and restriction are appropriate"). Moreover, refusing to enforce the venue-selection clause and its related provisions will deter corporations from imposing retroactive one-sided venue-selection clauses on consumers that enable them to transfer the case to whatever venue they deem appropriate, regardless of any presence or relation to the venue.

**B.    The Venue Selection Clause Waives Non-Waivable Rights under California Law.**

Where claims are based on "unwaivable rights created by California statutes," the burden shifts to the party *invoking* the forum selection clause to show that transfer "will not diminish in any way the substantive rights afforded … under California law." *Verdugo v. Alliantgroup*, 237 Cal. App. 4th 141, 147 (2015). Any "provision in *any* contract—even a contract that has no arbitration provision—that purports to waive, in all fora, the statutory right to seek public injunctive relief under the UCL, the CLRA, or the false advertising law is invalid and unenforceable under California law." *McGill v. Citibank, N.A.*, 393 P.3d 85, 94 (Cal. 5th 2017). The venue-selection clause is unenforceable under this policy.

-18-

While Plaintiffs are not California residents, non-residents may bring UCL claims against California corporations "if they can allege misconduct that occurs within or emanates from California." *Castagnola v. Hewlett–Packard Co.*, 2012 WL 2159385, at \*4 (N.D. Cal. June 13, 2012). Plaintiffs seek injunctive relief under the UCL that would benefit the public at large. (*E.g.*, Am Compl. ¶¶ 10, 266, 274); *see Kramer v. Coinbase, Inc.*, 105 Cal. App. 5th 741, 750 (2025) (finding plaintiffs brought claim for public injunctive relief where allegations asserted harm against the general public and injunction sought to prohibit a business from engaging in unfair or deceptive practices). Assessing the combined effect of the X Terms' intertwined choice-of-law and venue-selection provisions, the choice of a Texas venue and Texas law contravenes California public policy in an effort to totally evade all other states' consumer protections and to choose the judges it prefers.[11] *Bayol v. Zipcar, Inc.*, 2014 WL 4793935, at \*3 (N.D. Cal. Sept. 25, 2014) (considering choice of law and forum selection clause together); *Perry v. AT & T Mobility LLC*, 2011 WL 4080625, at \*4-\*5 (N.D. Cal. Sept. 12, 2011) (conducting the same analysis and noting that courts can look to both clauses when combined effect is to evade statutory protections). Texas does not afford consumers the right to bring claims for public injunctive relief. Tex. Bus. & Com. Code § 17.50 (providing that a "consumer who prevails may obtain . . . an order enjoining such acts or failure[s] to act" without referring to public injunctive relief); *Jialu Wu v. iTalk Glob. Commc'ns, Inc.*, 2020 WL 8461696, at \*5 (C.D. Cal. Oct. 21, 2020) (holding that Texas choice-of-law provision was unenforceable because Texas does not allow for public injunctions). By choosing a Texas forum and Texas law, this provision impermissibly waives public injunctive relief under the UCL. *McGill*, 393 P.3d at 94.

## IV.    The Public Interest Demands Invalidation of the Venue-Selection Clause.

Even if there is a valid, enforceable venue-selection clause here, this case is one of the "unusual cases" where public interest factors demand a lack of enforcement under § 1404. *Atl. Marine*, 571 U.S. at 62. X.AI seeks to deprive Plaintiffs of their unwaivable rights under California law, in contravention of California's strong public policy that allows them to pursue their claims.

As an initial matter, if there is no valid venue-selection clause, the parties appear to agree that

---

[11] In *St. Clair*, the court did not rely on Ninth Circuit precedent or consider any fundamental differences between New York and Texas law or any unwaivable right. 2026 WL 1803744, at \*5.

-19-

this case should remain in this District under a traditional § 1404(a) analysis. xAI does not attempt to answer the "threshold question" of "whether the case could have been brought in the forum to which the transfer is sought" in the absence of a venue-selection clause. *Roling v. E\*Trade Sec., LLC*, 756 F. Supp. 2d 1179, 1184 (N.D. Cal. 2010). There is no personal jurisdiction or venue over xAI in Texas because xAI is "at home" in California and Plaintiffs' claims do not arise out of or relate to any actions in Texas. *Phoong L. Corp. v. Primary Wave Media, LLC*, 2025 WL 2087557, at \*7 (C.D. Cal. June 6, 2025) (finding that lack of personal jurisdiction meant action could not have been brought in proposed transferee forum); 28 U.S.C. § 1391(b) (requiring "substantial" events giving rise to the claims for venue). xAI also does not attempt to argue that private interests weigh in favor of transfer for Plaintiffs South Carolina Doe, Ohio Doe, or New Jersey Doe if there is no venue-selection clause to enforce. Doing so would be an uphill climb because Plaintiffs' choice of forum should be given deference. *See Noriesta v. Konica Minolta Bus. Sols. U.S.A., Inc.*, 2019 WL 6482222, at \*4 (C.D. Cal. July 8, 2019) ("given the extent of Defendant's contacts with this District, the Court will give significant deference to Plaintiff's choice of forum"). And nearly all relevant evidence and witnesses are here, not in Texas. *Atl. Marine*, 571 U.S. at 62 n.6.

However, if the Court finds that South Carolina Doe, Ohio Doe, and New Jersey Doe consented to a valid venue-selection clause and that it applies to this case, then the following public interest factors weigh overwhelmingly in favor of keeping this case in this District.

> the administrative difficulties flowing from court congestion; the local interest in having localized controversies decided at home; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty.

*Atl. Marine*, 571 U.S. at 62 n.6; *Fleming v. Matco Tools Corp.*, 384 F. Supp. 3d 1124, 1136 (N.D. Cal. 2019) (applying these same factors) (citation omitted). The Court should also decline enforcement because "enforcement would contravene a strong public policy of the forum in which suit is brought, whether declared by statute or by judicial decision" and "trial in the contractual forum will be so gravely difficult and inconvenient that [the litigant] will for all practical purposes be deprived of his day in court." *Gemini Techs., Inc. v. Smith & Wesson Corp.*, 931 F.3d 911, 915 (9th Cir. 2019)

-20-

Here, California has a "significant interest in providing a forum for those harmed by the actions of its corporate citizens." *Carijano v. Occidental Petroleum Corp.*, 643 F.3d 1216, 1232-33 (9th Cir. 2011). This "significant interest" applies to California residents and non-residents. *Id.* ("California courts have repeatedly recognized the state's interest in deciding actions against resident corporations whose conduct in this state causes injury to persons in other jurisdictions."). And the California Supreme Court has suggested that California *must* provide a forum if product manufactured in the state, by a resident corporation with its principal place of business in the state, if that corporation causes injury in other fora. *Stangvik v. Shiley*, 54 Cal.3d 744, 761 n.14 (1991). While no Plaintiff is a resident of California, California's interest in regulating companies operating in its borders "give[s] rise to a clear 'local interest in the controversy[.]'" *Jackson v. Tesla, Inc.*, 772 F. Supp. 3d 1111, 1119 (N.D. Cal. 2025). The public interest would also be served by "a forum that is at home with the law that must govern the action" by having a California court decide questions of California law. *Atl. Marine*, 571 U.S. at 62 n.6. The combined choice-of-law and venue selection provisions would deny California its "significant interest" in regulating California corporations, and contravene the unwaivable provision for public injunctive relief that Plaintiffs seek. *Carijano*, 643 F.3d at 1232-33; *McGill*, 393 P.3d at 94.

Moreover, based on these facts, "enforcement would contravene a strong public policy of the forum in which suit is brought." *Gemini*, 931 F.3d at 915. As explained more fully above, by choosing a Texas forum and Texas law, the X Terms impermissibly waive Plaintiffs' right to assert a claim for public injunctive relief under the UCL, a matter which California considers significant. *McGill.*, 393 P.3d at 94; *see supra* § III.B. Whether viewed as a matter of contract enforcement or as a matter of analyzing the relevant public interest factors under § 1404(a), these provisions are unenforceable.

In addition, transfer to Texas would be "so gravely difficult and inconvenient that [Plaintiffs] will for all practical purposes be deprived of [their] day in court." *Gemini*, 931 F.3d at 915. Plaintiffs would be unable to assert California claims against a California company if the X Terms are given effect. *See supra* § II.A.ii. They would be forced to gather all relevant evidence in California, then travel to Texas to present that evidence to support relatively small dollar individual claims. The combined practical effect of the X Terms is to deprive Plaintiffs of their day in court.

-21-

**V.      South Carolina Roe's Claims Should Not Be Transferred.**

X.AI does not contend that South Carolina Roe is bound by a venue-selection clause yet seeks to bind her to the same unconscionable clause as all Plaintiffs. (Motion at 7 (noting that South Carolina Roe's claims do not relate to content on X).) Courts in analogous circumstances undertake a multistep analysis. Courts (1) "assume[ ] that *Atlantic Marine* applies to parties who agreed to forum-selection clauses" and apply the *Atlantic Marine* test for those parties; (2) "consider[ ] the private and public interests relevant to the non-contracting parties"; (3) "when the analyses 'point different ways' a district court should 'consider[ ] severance'"; then (4) "exercises its discretion ... in choosing the most appropriate course of action." *Phoong L. Corp. v. Primary Wave Media, LLC*, 2025 WL 2087557, at *7 (C.D. Cal. June 6, 2025); *In re: Howmedica Osteonics Corp*, 867 F.3d 390, 408 (3d Cir. 2017) (conducting the same analysis). Assuming, for the sake of argument, that the venue-selection clause results in all other Plaintiffs' claims being transferred to federal courts in Tarrant County (step one), South Carolina Roe's claims point decisively against transfer under the relevant § 1404 factors (step two), and the Court should sever South Carolina Roe's claims because her case could not have been brought in the Northern District of Texas (step three). The most efficient course is to sever South Carolina Roe's claims because this District is home to X.AI and there is already a pending, related case that she can participate in (step four).

*At step one*, the *Atlantic Marine* analysis forbids transfer under § 1404 even if South Carolina Doe, Ohio Doe, and New Jersey Doe are "parties who agreed to forum-selection clauses." *See supra* Section IV.  If the Court agrees, then it can deny X.AI's Motion in its entirety. If not, the Court must proceed to step two.

*At step two*, the private and public interests in South Carolina Roe's case point decisively against transfer. As a threshold matter, the Northern District of Texas is not a "district or division where [this action] might have been brought" originally. 28 U.S.C. § 1404(a). There is no personal jurisdiction over X.AI in Texas because X.AI is "at home" in California and South Carolina Roe's claims do not arise out of or relate to any actions in Texas. *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 256 (2017) (citation omitted); *Phoong L. Corp.*, 2025 WL 2087557, at *7 (finding that lack of personal jurisdiction meant action could not have been

-22-

brought originally in New York). Likewise, X.AI does not explain how venue could be proper in the Northern District of Texas. X.AI does not reside there, nor did "a substantial part of the events or omissions giving rise to the claim" occur there. 28 U.S.C. § 1391.

The private interest factors also weigh heavily against transfer. South Carolina Roe's "choice of this district as the forum in which to litigate her case is entitled to weight." *Jackson*, 772 F. Supp. 3d at 1118 (giving weight to non-California-based plaintiff's choice of forum). Contrary to X.AI's reading of the caselaw, Motion at 26, "a plaintiff's choice of forum receives only minimal deference if the operative facts did not occur within the forum and the forum has no interest in the parties or subject matter." *Doe v. Epic Games, Inc*., 435 F. Supp. 3d 1024, 1041 (N.D. Cal. 2020). This District is the only District that makes sense for a case on behalf of Plaintiffs from multiple states seeking to represent a nationwide class against X.AI. This District is where X.AI designed, created, and managed Grok, and where Grok generated the images that gave rise to this case. Though residents are given more deference than non-residents, South Carolina Roe's choice of forum should still be given deference. *See Noriesta*, 2019 WL 6482222, at *4 ("given the extent of Defendant's contacts with this District, the Court will give significant deference to Plaintiff's choice of forum").

In addition, the "relative ease of access to sources of proof; availability of compulsory process for attendance of unwilling, and the cost of obtaining attendance of willing, witnesses; [and] possibility of view of premises, if view would be appropriate to the action" weigh strongly in favor of this forum. *Atl. Marine*, 571 U.S. at 62 n.6. X.AI identifies no witnesses or evidence located in Tarrant County. Public reporting suggests that there is no connection between X and Tarrant County, much less X.AI and Tarrant County.[12] All relevant X.AI employees are based in Palo Alto, California, and former employees are likely to be located in the surrounding area. X.AI's corporate headquarters in Palo Alto "houses our advanced AI research, development, and engineering teams . . . . The engineers responsible for the design, training, and continued evolution of Grok, our proprietary frontier AI model, are based at this facility."[13] Because this District hosts a booming AI industry, it is

---

[12] Osibamowo, *supra* n.2 (noting Bastrop is "not part of the Northern District of Texas, where it's unclear if the company has any ties.").

[13] SpaceX, Form S-1 at 211.

no surprise that former employees, including X.AI whistleblowers, continue to reside in this District. *See* Rios Decl., Ex. B (complaint of former X.AI employee who was domiciled in Santa Clara County); *Epic*, 435 F. Supp. 3d at 1042 ("[T]he convenience of the witnesses, particularly non-party witnesses, is often the most important factor.") (citation omitted). Given South Carolina Roe's choice of forum and that nearly all relevant evidence and witnesses are in this District, all private interests weigh overwhelmingly against transfer. In combination with the public interest factors discussed above, all relevant factors weigh against transfer.

At step three, if the Court finds that the § 1404 factors weigh in favor of transferring the claims of South Carolina Doe, Ohio Doe, and New Jersey Doe, but not the claims of South Carolina Roe, the Court should consider severance. Unlike the cases upon which X.AI relies, where there is no apparent dispute over whether the transferee court is a venue where claims "might have been brought" originally, the fact that South Carolina Roe could not have sued in the Northern District of Texas means that her claims *must* be severed. 28 U.S.C. § 1404(a); *In re: Howmedica Osteonics Corp.*, 867 F.3d at 409 (holding that "lack of personal jurisdiction . . . requires severance" and is "mandatory"); *Phoong L. Corp.*, 2025 WL 2087557, at *7 (same); 28 U.S.C. § 1391(b) (requiring "a substantial part of the events or omissions giving rise to the claim" or defendant's residence).

At step four, the Court considers "efficiency, the non-contracting parties' private interests," and other factors under *Atlantic Marine*. *In re Howmedica*, 867 F.3d at 409. The private interests of South Carolina Roe and X.AI weigh strongly in favor of severance because the parties will try this case in the District where most relevant events occurred. *Id.* (noting that severance and transfer to California was appropriate because defendant was "a California corporation"). Moreover, keeping South Carolina Roe's claims here will result in more efficiency. Unlike cases upon which X.AI relies, there will be duplicative litigation even if South Carolina Roe's claims are transferred. A class case on behalf of other individuals whom Grok depicted in sexualized and revealing deepfakes is pending and related before the Court. Like South Carolina Roe, the plaintiffs in *Doe 1, et al. v. x.AI Corp., et al.*, No. 5:26-cv-2246 (N.D. Cal.) invoke tort claims including design defect, negligence, invasion of privacy, intentional infliction of emotional distress, negligent infliction of emotional distress, and public nuisance claims in addition to statutory claims under the California Unfair Competition Law

-24-

and the California Right of Publicity law. No. 5:26-cv-2246, ECF No. 1, ¶¶ 150-239. Like South Carolina Roe, the plaintiffs in the related action were depicted as minors and do not allege that the images created of them were disseminated on X. *Id.* ¶¶ 78-103. If all other Plaintiffs' claims in this action are transferred, the most equitable result is to allow South Carolina Roe's claims to be tried here in conjunction with the related action.

X.AI's remaining argument—that South Carolina Roe is bound simply because she joined this case—ignores serious differences between this case and the two cases upon which X.AI relies. (Motion at 28.) In *Cung Le v. Zuffa, LLC*, the "non-signatory plaintiffs" had, in fact, agreed to an alternative forum selection clause, and the other forum selection clause made "clear that it applies to *actions* to interpret or enforce the contracts[.]" 108 F. Supp. 3d 768, 775 n.4 (N.D. Cal. 2015). Here, X.AI does not claim that the X Terms' venue-selection clause applies to South Carolina Roe's claims, and, also unlike in *Cung Le*, South Carolina Roe does not invoke a contract with a forum selection clause to support her claims. *Id.* at 776. And unlike in *Bromlow v. D & M Carriers, LLC*, X.AI had not previously filed a motion to transfer that would explain the scope of the relief sought. 438 F. Supp. 3d 1021, 1029 (N.D. Cal. 2020). To the extent South Carolina Roe assumed any risk, it was minimal, considering the existence of another, pending case involving substantially similar claims and the lack of any colorable argument that the X Terms have any bearing on her case. She should not be punished for filing a case in the District where X.AI is based and core issues that affect her will be decided, with individuals who were similarly harmed.

## CONCLUSION

There is no reason to send this case to a forum with no connection to any party or the events giving rise to Plaintiffs' claims. Neither the X Terms nor § 1404(a) command such a result. The interests of the parties and the public point decisively towards allowing this case to proceed in this Court.

-25-

Dated:  June 26, 2026

Respectfully submitted,

BERGER MONTAGUE PC
*/s/ Sophia M. Rios*
Sophia M. Rios, SBN 305801
8241 La Mesa Blvd., Suite A
La Mesa, CA 91942
Tel: (619) 489-0300
srios@bergermontague.com

E. Michelle Drake*
1229 Tyler Street NE, Suite 205
Minneapolis, MN 55413
Tel: (612) 594-5999
emdrake@bergermontague.com

James Hannaway, *pro hac vice*
1001 G Street, NW
Suite 400 East
Washington, DC 20001
Tel: (202) 559-9740
jhannaway@bergermontague.com

* *pro hac vice* forthcoming

*Counsel for Plaintiffs*

-26-