SAWYER & LABAR LLP
ADRIAN SAWYER (State Bar No. 203712)
  *sawyer@sawyerlabar.com*
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820

CAHILL GORDON & REINDEL LLP
JOEL KURTZBERG (*admitted pro hac vice*)
  *jkurtzberg@cahill.com*
IVAN TORRES (*admitted pro hac vice*)
  *itorres@cahill.com*
32 Old Slip
New York, New York 10005
Telephone: 212.701.3120

*Counsel for Defendants*
*X.AI Corp. and X.AI LLC*

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN JOSE DIVISION

| | |
|---|---|
| JANE DOE, SOUTH CAROLINA ROE, NEW JERSEY DOE, and OHIO DOE on behalf of themselves and all others similarly situated,<br><br>          Plaintiffs,<br><br>     v.<br><br>X.AI CORP. and X.AI LLC,<br><br>          Defendants. | Case No. 5:26-cv-00772-PCP<br><br>**DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)**<br><br>Date:  July 30, 2026<br>Time:  9:00 a.m.<br>Crtrm:  8, 4th Floor<br><br>**Judge:**  Hon. P. Casey Pitts |

Case No. 5:26-cv-00772-PCP

# **TABLE OF CONTENTS**

I.    INTRODUCTION ................................................................................................................ 1

II.   ARGUMENT ...................................................................................................................... 1

   A.   The FSC Plaintiffs Agreed to the X Terms of Service When Signing Up for X ................. 1

      1.   Notice of the X Terms of Service Was Reasonably Conspicuous ................................... 2

      2.   The FSC Plaintiffs Unambiguously Manifested Assent ................................................... 4

   B.   The FSC Plaintiffs Agreed to the Updated X Terms of Service .......................................... 6

   C.   Version 21 of the X Terms of Service Governs this Dispute ............................................... 8

   D.   Defendants Are Intended Third-Party Beneficiaries of X's Terms of Service .................... 9

   E.   The X Terms of Service Are Not Unconscionable.............................................................. 10

      1.   The X Terms of Service Are Not Procedurally Unconscionable ................................... 10

      2.   X's Terms of Service Are Not Substantively Unconscionable ...................................... 11

   F.   Enforcing the Forum-Selection Clause Does Not Contravene Public Policy .................... 13

   G.   Texas Is a Suitable Forum................................................................................................... 14

   H.   South Carolina Roe's Claims Should Be Transferred As Well .......................................... 14

III.  CONCLUSION ................................................................................................................ 15

Case No. 5:26-cv-00772-PCP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN
DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Argueta* v. *Banco Mexicano, S.A.*,
 87 F.3d 320 (9th Cir. 1996) ........................................................................................ 12

*Atl. Marine Const. Co.* v. *U.S. Dist. Ct. for W. Dist. of Texas*,
 571 U.S. 49 (2013) ...................................................................................................... 14

*ATSC Melrose, Inc.* v. *IDEXX Distribution, Inc.*,
 2026 WL 936937 (C.D. Cal. Apr. 1, 2026) ................................................................. 12

*Azeveda* v. *Comcast Cable Commc'ns LLC*,
 2019 WL 5102607 (N.D. Cal. Oct. 11, 2019) ............................................................... 9

*Berman* v. *Freedom Fin. Network, LLC*,
 30 F.4th 849 (9th Cir. 2022) ......................................................................................... 7

*Blackburn* v. *ClassPass USA LLC*,
 2026 WL 962734 (N.D. Cal. Apr. 9, 2026) ............................................................. 3, 6

*Bromlow* v. *D & M Carriers, LLC*,
 438 F. Supp. 3d 1021 (N.D. Cal. 2020) ...................................................................... 15

*Chabolla* v. *ClassPass Inc.*,
 129 F.4th 1147 (9th Cir. 2025) ................................................................................. 2, 5

*Cohen* v. *CBR Sys., Inc.*,
 625 F. Supp. 3d 997 (N.D. Cal. 2022) ........................................................................ 11

*Compound Sols., Inc.* v. *CoreFX Ingredients, LLC*,
 2020 WL 3639663 (S.D. Cal. July 6, 2020) ............................................................... 13

*Cordero* v. *Coinbase, Inc.*,
 2025 WL 2223495 (N.D. Cal. Aug. 5, 2025) .............................................................. 11

*Cung Le* v. *Zuffa, LLC*,
 108 F. Supp. 3d 768 (N.D. Cal. 2015) ........................................................................ 15

*Davis* v. *Experian Info. Sols., Inc.*,
 2025 WL 2998157 (N.D. Cal. Oct. 24, 2025) ............................................................. 10

*DePuy Synthes Sales, Inc.* v. *Howmedica Osteonics Corp.*,
 28 F.4th 956 (9th Cir. 2022) ...................................................................................... 12n

*E. Bay Women's Health, Inc.* v. *gloStream, Inc.*,
 2014 WL 1618382 (N.D. Cal. Apr. 21, 2014) ............................................................ 13

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN
DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

*Eliza Labs, Inc. v. X Corp.*,
   2025 WL 3003766 (N.D. Cal. Oct. 27, 2025) .......................................................................... 13

*Erickson* v. *Nebraska Mach. Co.*,
   2015 WL 4089849 (N.D. Cal. July 6, 2015) ............................................................................ 2n

*In re Facebook Biometric Info. Priv. Litig.*,
   185 F. Supp. 3d 1155 (N.D. Cal. 2016) .................................................................................. 6

*Flanagan* v. *Flanagan*,
   27 Cal. 4th 766 (2002)........................................................................................................... 10

*Fuentes* v. *Empire Nissan, Inc.*,
   19 Cal. 5th 93 (2026)............................................................................................................... 9

*Garcia* v. *Top Rank, Inc.*,
   2014 WL 12791946 (C.D. Cal. Sept. 9, 2014)........................................................................ 12

*Gaston* v. *Gottesman*,
   2007 WL 1114014 (N.D. Cal. Apr. 13, 2007) ........................................................................ 15

*Ghazizadeh* v. *Coursera, Inc.*,
   737 F. Supp. 3d 911 (N.D. Cal. 2024) ............................................................................. 3, 4, 5

*Great Am. Ins. Co. of NY* v. *Nippon Yusen Kaisha*,
   2013 WL 3850675 (N.D. Cal. May 10, 2013) ........................................................................ 12

*Hodges* v. *Hertz Corp.*,
   351 F. Supp. 3d 1227 (N.D. Cal. 2018) ................................................................................. 2n

*Howards* v. *Fifth Third Bank*,
   2018 WL 7890667 (C.D. Cal. Dec. 7, 2018) .......................................................................... 13

*Hunter* v. *Pre-Paid Legal Servs., Inc.*,
   2025 WL 3101978 (N.D. Cal. Nov. 6, 2025)........................................................................... 12

*Jialu Wu* v. *iTalk Glob. Commc'ns, Inc.*,
   2020 WL 8461696 (C.D. Cal. Oct. 21, 2020) ....................................................................... 14n

*Kabbash* v. *Jewelry Channel, Inc. USA*,
   2016 WL 9132930 (C.D. Cal. Feb. 22, 2016)......................................................................... 13

*Kamath* v. *Coinbase, Inc.*,
   2024 WL 950163 (N.D. Cal. Mar. 5, 2024) ............................................................................. 6

*Keebaugh* v. *Warner Bros. Ent. Inc.*,
   100 F.4th 1005 (9th Cir. 2024)........................................................................................... 2n, 3

iv                                    Case No. 5:26-cv-00772-PCP

*Lawson* v. *DoorDash, Inc.*,
   2023 WL 2782314 (N.D. Cal. Jan. 31, 2023) .......................................................................... 15

*Link* v. *Wabash R. Co.*,
   370 U.S. 626 (1962) ................................................................................................................. 15

*Manetti-Farrow, Inc.* v. *Gucci America, Inc.*,
   858 F.2d 509 (9th Cir. 1988) ................................................................................................... 12

*Marano Enters. of Kansas* v. *Z-Teca Restaurants, L.P.*,
   254 F.3d 753 (8th Cir. 2001) ................................................................................................... 14

*Mitek Sys., Inc.* v. *United Servs. Auto. Ass'n*,
   2020 WL 1922635 (N.D. Cal. Apr. 21, 2020) .......................................................................... 15

*Oberstein* v. *Live Nation Ent., Inc.*,
   60 F.4th 505 (9th Cir. 2023) ...................................................................................................... 2

*Patrick* v. *Running Warehouse, LLC*,
   93 F.4th 468 (9th Cir. 2024) ...................................................................................................... 5

*Ray* v. *Google LLC*,
   2023 WL 7305048 (N.D. Cal. Nov. 6, 2023) .......................................................................... 11

*Regan* v. *Pinger, Inc.*,
   2021 WL 706465 (N.D. Cal. Feb. 23, 2021) .............................................................................. 5

*Run Them Sweet, LLC* v. *CPA Glob. Ltd.*,
   2016 WL 6216874 (N.D. Cal. Oct. 25, 2016) .......................................................................... 13

*Sadlock* v. *Walt Disney Co.*,
   2023 WL 4869245 (N.D. Cal. July 31, 2023) ............................................................................ 6

*Simonoff* v. *Expedia, Inc.*,
   643 F.3d 1202 (9th Cir. 2011) ................................................................................................. 12

*Slaviero* v. *Baby List, Inc.*,
   2026 WL 1097746 (N.D. Cal. Apr. 22, 2026) .................................................................. 2, 4, 7

*St. Clair* v. *X.AI Holdings Corp.*,
   2026 WL 1803744 (S.D.N.Y. June 23, 2026) .......................................................................... 10

*State Farm Gen. Ins. Co.* v. *Watts Regul. Co.*,
   17 Cal. App. 5th 1093 (2017) .................................................................................................... 8

*Trudeau* v. *Google LLC*,
   349 F. Supp. 3d 869 (N.D. Cal. 2018) ....................................................................................... 9

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN
DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

*Trupia* v. *X Corp.*,
   2026 WL 381823 (N.D. Cal. Feb. 11, 2026) ..................................................................... 10, 14

*Walters* v. *Famous Transports, Inc.*,
   488 F. Supp. 3d 930 (N.D. Cal. 2020) ................................................................................ 14

*White* v. *PayPal Holdings Inc.*,
   821 F. Supp. 3d 1058 (N.D. Cal. 2026) ..................................................................... 2, 3, 4, 5

**Statutes**

28 U.S.C. § 1404 ................................................................................................................. 14

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

## I.   INTRODUCTION[1]

This case belongs in the courts in Texas. The allegations of all but one of the Plaintiffs (the FSC Plaintiffs) focus solely on harm allegedly caused by images created by third parties on the X platform using Grok. Each of those plaintiffs agreed through the X Terms of Service to litigate any claims involving X's "Services" or the "Services" of X's U.S. corporate affiliates (who are expressly named as "third-party beneficiaries") exclusively in the Texas courts. Defendants are "corporate affiliates" of X Corp. (Scolari Decl. I ¶ 40) and third-party beneficiaries of the X Terms of Service.

The FSC Plaintiffs had actual and constructive notice many times over of the relevant terms: the terms were clearly identified and linked to when the accounts were created, were linked to and flagged when relevant changes were made, were affirmatively acknowledged by each FSC Plaintiff (by clicking on a button), were described in plain English in X blog posts and news stories when changes were made, and were known to Plaintiffs' counsel in this case before the Amended Complaint was filed. For this reason, multiple courts in this District have applied X's terms to cases involving X.AI on nearly identical fact patterns to this one. Under controlling law, this is not even a close call: the forum-selection clause is enforceable, and this case belongs in the N.D. Texas.

As to the one remaining Plaintiff (South Carolina Roe), transfer is appropriate because South Carolina Roe's counsel had notice of the forum-selection clause and its applicability here before filing the Amended Complaint and chose to bring her case along with that of the FSC Plaintiffs; transfer is also in the interests of justice because, without a transfer, there will be duplicative proceedings concerning identical issues that could yield contradictory rulings and results.

## II.   ARGUMENT

### A.  The FSC Plaintiffs Agreed to the X Terms of Service When Signing Up for X

The X Terms of Service were presented to the FSC Plaintiffs as sign-in wrap agreements, which under California law, are enforceable "based on inquiry notice if (1) the website provides reasonably conspicuous notice of the terms to which the consumer will be bound; and (2) the

---

[1] Emphasis in quotations is added and internal citations and quotations have been omitted. "Motion" or "Mot." refers to ECF 41; "Scolari Decl. I" refers to ECF 41-3; "Opposition" or "Opp." refers to ECF 44. Capitalized terms not defined herein shall have the meaning assigned in the Motion.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

consumer takes some action, such as clicking a button or checking a box, that unambiguously manifests his or her assent to those terms." *Slaviero* v. *Baby List, Inc.*, 2026 WL 1097746, at *2 (N.D. Cal. Apr. 22, 2026). Courts "conduct[] a fact-intensive inquiry," applying "an objective-reasonableness standard." *Oberstein* v. *Live Nation Ent., Inc.*, 60 F.4th 505, 513–14 (9th Cir. 2023).

When the FSC Plaintiffs created their X accounts, they were provided "reasonably conspicuous notice" of the X Terms of Service on the sign-up page and were required to manifest their assent by affirmatively clicking a button.[2] Thus, the FSC Plaintiffs each agreed to the version of the X Terms of Service in effect when they joined the X platform: New Jersey Doe to Version 1, South Carolina Doe to Version 4, and Ohio Doe to Version 19. Scolari Decl. II ¶¶ 9, 12, 15.

### 1. Notice of the X Terms of Service Was Reasonably Conspicuous

"To determine if the website provided reasonably conspicuous notice of the terms to which the consumer will be bound, courts evaluate the context of the transaction and the visual aspects of the website." *Slaviero*, 2026 WL 1097746, at *3. The context and visual aspects of the website here support a finding that the FSC Plaintiffs had sufficient notice of the relevant terms.

First, the context of the transaction here—i.e., creating an X account—is indicative of notice. "Where the nature of the transaction . . . anticipates some sort of continuing relationship . . . that would require some terms and conditions, a user should expect that certain relationships are bound by terms." *White* v. *PayPal Holdings Inc.*, 821 F. Supp. 3d 1058, 1066 (N.D. Cal. 2026) (Pitts, J.); *see also Chabolla* v. *ClassPass Inc.*, 129 F.4th 1147, 1156 (9th Cir. 2025) ("[A] user who signs up for an account . . . clearly contemplate[s] some sort of continuing relationship."). Courts have found users had contextual notice and should have expected to be bound by terms when they downloaded an app (*see Keebaugh*, 100 F.4th at 1020), created an account online (*see Blackburn* v. *ClassPass*

---

[2] Defendants have provided screenshots of the X sign-up pages each FSC Plaintiff used to create their accounts (*see* July 15, 2026 Declaration of Megan Scolari ("Scolari Decl. II")), which can be considered on reply because it responds directly to arguments raised in Plaintiffs' Opposition. *See Hodges* v. *Hertz Corp.*, 351 F. Supp. 3d 1227, 1249 (N.D. Cal. 2018). The Court may also take judicial notice of this evidence. *See Erickson* v. *Nebraska Mach. Co.*, 2015 WL 4089849, at *1 n.1 (N.D. Cal. July 6, 2015). Furthermore, because these screenshots are "not subject to factual dispute," the Court may decide the issue of constructive notice as a matter of law. *Keebaugh* v. *Warner Bros. Ent. Inc.*, 100 F.4th 1005, 1015 (9th Cir. 2024).

*USA LLC*, 2026 WL 962734, at \*7 (N.D. Cal. Apr. 9, 2026)), or signed up to use online services (*see Ghazizadeh* v. *Coursera, Inc.*, 737 F. Supp. 3d 911, 925 (N.D. Cal. 2024)).

Second, the design of the sign-up pages the FSC Plaintiffs used to create their X accounts provided reasonably conspicuous notice of the X Terms of Service. "For notice to be reasonably conspicuous, it must be displayed in a font size and format such that the court can fairly assume that a reasonably prudent Internet user would have seen it. Courts also consider text placement and the overall screen design to determine conspicuousness." *White*, 821 F. Supp. 3d at 1066.

When New Jersey Doe created his X account on March 25, 2009 (Scolari Decl. I ¶ 7), he saw the sign-up page attached as Exs. 16 and 17 to the Scolari Decl. II. New Jersey Doe was able to access the then-current X Terms of Service from this sign-up page through the "Terms of Service" hyperlink at the bottom of the page. Several aspects of this page support a finding of constructive notice: (i) it is easy to read and not overly cluttered; (ii) the "Terms of Service" hyperlink is located right below the "Create my account" button; (iii) the line of text containing the "Terms of Service" hyperlink is marked with a large bird graphic that draws the user's eye to the information; (iv) the "Terms of Service" hyperlink is highlighted in blue, making it stand out; and (v) the terms of service notice is in the same font and color as most of the page—i.e., not a small or opaque font.

When South Carolina Doe created her X account on March 6, 2011 (Scolari Decl. I ¶ 7), she saw the sign-up page attached as Ex. 18 to the Scolari Decl. II. South Carolina Doe was able to access the then-current X Terms of Service from this sign-up page in three ways: (i) there was a scrollable version contained directly in the "Terms of Service" box; (ii) through the "Printable version" hyperlink directly under the "Terms of Service" heading; and (iii) through the "Terms of Service" hyperlink above the "Create my account" button. Several aspects of this page support a finding of constructive notice: (i) the X Terms of Service were viewable directly on the sign-up page; (ii) the page is easy to read and not overly cluttered; (iii) the "Terms of Service" hyperlink appears right above the "Create my account" button; (iv) the hyperlinks to the X Terms of Service are highlighted in blue, indicating that they are hyperlinks; and (v) all references to the X Terms of Service are in a readable size and font.

When Ohio Doe created her X account on March 18, 2024 (Scolari Decl. I ¶ 7), she saw the sign-up page attached as Ex. 19 to the Scolari Decl. II. Ohio Doe was able to access the then-current X Terms of Service from this sign-up page through the "Terms of Service" hyperlink under the "Create account" button. Several aspects of this page support a finding of constructive notice: (i) the page is easy to read and not overly cluttered; (ii) the "Terms of Service" hyperlink appears right below the "Create account" button; (iii) the "Terms of Service" hyperlink is highlighted in blue, indicating that it is a hyperlink; and (iv) the line of text containing the "Terms of Service" hyperlink is one of the only sentences on the page. Based on both "the context of the transaction and the visual aspects of the website[,]" the FSC Plaintiffs were provided reasonably conspicuous notice of the X Terms of Service when they signed up for the X platform. *Slaviero*, 2026 WL 1097746, at *3.

### 2. The FSC Plaintiffs Unambiguously Manifested Assent

"An online user unambiguously manifests assent to terms only if the user is explicitly advised that the act of clicking will constitute assent to the terms and conditions of an agreement." *White*, 821 F. Supp. 3d at 1066. Here, each of the sign-up pages made clear that by creating an X account the FSC Plaintiffs were accepting the X Terms of Service. New Jersey Doe was advised that, "By clicking on 'Create my account' above, you confirm that you are over 13 years of age and accept the Terms of Service." Scolari Decl. II ¶ 19. South Carolina Doe was advised that, "By clicking on 'Create my account' below, you are agreeing to the Terms of Service above and the Privacy Policy." *Id.* ¶ 22. And Ohio Doe was advised that, "By signing up, you agree to the Terms of Service and Privacy Policy, including Cookie Use." *Id.* ¶ 25. When the FSC Plaintiffs clicked the "Create my account" or "Create account" button—as required to join X (Scolari Decl. I ¶ 8)—they unambiguously manifested their assent to the X Terms of Service. *See, e.g.*, *Ghazizadeh*, 737 F. Supp. 3d at 930. In all cases, the language was clear that "the act of clicking [would] constitute assent to the terms and conditions of an agreement." *White*, 821 F. Supp. 3d at 1066.

The Opposition does not seriously dispute that New Jersey Doe and South Carolina Doe were on notice that by creating an X account they agreed to the X Terms of Service. Nor could it. The advisal language and button manifesting assent on their respective sign-up pages matched 1:1—

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

i.e., both used the phrase "Create my account." As to Plaintiff Ohio Doe, the Opposition wrongly argues that she did not unambiguously manifest her assent because of a supposed conflict between the advisal language ("by signing up") and the button ("Create account"). Opp. at 7. But this type of overly technical argument has been repeatedly rejected by courts in this Circuit where it is obvious—as it is here—that the advisal language relates to clicking the button. *See, e.g.*, *Ghazizadeh*, 737 F. Supp. 3d at 929–30 (rejecting argument that "discrepancy between the 'Sign Up' language and the 'creating an account' instruction" created ambiguity); *Regan* v. *Pinger, Inc.*, 2021 WL 706465, at \*8 (N.D. Cal. Feb. 23, 2021) (finding mutual assent where "disclosure that read 'By registering, I agree to Sideline's Terms and Conditions,' [was] located immediately above the 'Create Account' button"); *Patrick* v. *Running Warehouse, LLC*, 93 F.4th 468, 474, 477 (9th Cir. 2024) (finding mutual assent where advisal language read "By submitting your order you . . ." and button read "Place Order"). Here, under the applicable objective-reasonableness standard, Ohio Doe should have understood that, whether phrased as "creating" or "signing up" for an account, by clicking the button, she was joining the X platform and assenting to the X Terms of Service.

The Opposition's reliance on *Chabolla* on this point (*see* Opp. at 7) is misplaced. There, the Ninth Circuit considered whether clicking a button labeled "Continue" manifested assent where the advisal language read "[b]y signing up . . . ." *Chabolla*, 129 F.4th at 1158. The Court held that it did not, because it was unclear to users that clicking the "Continue" button constituted signing up. *Id.* ("At no point on any screen is a user advised that a particular action has 'signed her up' or will 'sign her up.'"). No such ambiguity exists here. The sign-up page that Ohio Doe used to create her X account made clear that its sole purpose was for users to join the X platform—it featured a bold heading that read "Join today." Scolari Decl. II, Ex. 19. This resembles the sign-up page in *Blackburn*, where the court distinguished *Chabolla* and found that there was mutual assent because the sign-up page clearly stated that its purpose was for users to sign up for ClassPass. 2026 WL 962734, at \*7 ("[I]n *Chabolla*, there was no indication that a user was ever signing up. Here, at the top of the 2019 Sign Up Screen there is a heading that unambiguously reads in bold lettering: Sign up."). This Court should reject Plaintiffs' attempt to manufacture an ambiguity where none exists.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

**B.  The FSC Plaintiffs Agreed to the Updated X Terms of Service**

Plaintiffs argue that—despite the FSC Plaintiffs' continued use of the X platform (*see* Scolari Decl. I ¶ 38)—the FSC Plaintiffs never agreed to Version 20 or 21 of the X Terms of Service. Opp. at 8–9. That argument is unsupported by both the facts and the law. As to the facts, it is undisputed that each of the FSC Plaintiffs received explicit notice that their continued use of the platform would bind them to the updated versions of the X Terms of Service. *See* Scolari Decl. I, Exs. 3, 9. As to the law, courts in this District have consistently held that users agree to updated terms of service when, as here, they are (i) given notice of the updated terms and (ii) informed that their continued use will constitute assent. *See, e.g.*, *Kamath* v. *Coinbase, Inc.*, 2024 WL 950163, at \*1, \*4 (N.D. Cal. Mar. 5, 2024) (assent through continued use where user was notified "that if she wanted to continue using her account, she would need to accept the updated [terms]"); *Sadlock* v. *Walt Disney Co.*, 2023 WL 4869245, at \*12 (N.D. Cal. July 31, 2023) ("[C]ontinued use is sufficient to establish assent"); *In re Facebook Biometric Info. Priv. Litig.*, 185 F. Supp. 3d 1155, 1167 (N.D. Cal. 2016).

Plaintiffs do not and cannot dispute that the FSC Plaintiffs were all given sufficient notice that X was updating the X Terms of Service to Version 21.[3] Beginning on December 16, 2025, X's users began receiving a prompt (the "Prompt") on their homepage informing them that X had updated the X Terms of Service and including a blue hyperlink to Version 21. *See* Scolari Decl. I ¶ 29. Each of the FSC Plaintiffs timely clicked the "Got it" button embedded in the Prompt, thereby confirming that they had received notice of Version 21 of the X Terms of Service. *Id.* ¶ 37.

The FSC Plaintiffs also received notice that their continued use of the X platform would constitute assent to Version 21. The Prompt plainly stated that, "We're updating our Terms of Service . . . . If you want to learn more about these changes, head to the X Privacy Center." Scolari Decl. I, Ex. 10. Any reasonably diligent X user would have understood from this Prompt that (i) the X Terms of Service governing their use of the X platform were changing and (ii) they could (and should) learn what those changes are. The words "X Privacy Center" were also highlighted with a

---

[3] Defendants focus on the FSC Plaintiffs' assent to Version 21 of the X Terms of Service, as that version was in place when the operative pleading was filed, but the same procedures, and thus notice and assent, were followed for Version 20 as well. *See* Scolari Decl. I ¶¶ 20–25, 37.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

blue hyperlink that took users to a December 16, 2025 blog post summarizing the changes in plain English and in bullet point form. *Id*. at Ex. 9. That blog post explained that: "***If you continue to use our products or services on or after January 15, 2026, you agree to the updated X Terms of Service***." *Id.* The FSC Plaintiffs received the Prompt, were instructed to review the post explaining the impact of these updates, and thus, had sufficient notice that their continued use of X was binding.

Plaintiffs' only answer to this blog post—buried in a footnote—is that the link to it was "not sufficiently prominent on the screen or in proximity to the 'Got It' button." Opp. at 8 n.4. But the facts indicate otherwise. *See* Scolari Decl. I, Ex. 10 (showing the Prompt with the "Got it" button right next to the blue hyperlink for the blog post). And the sole case that Plaintiffs cite in support of that proposition, *Berman* v. *Freedom Fin. Network, LLC*, 30 F.4th 849 (9th Cir. 2022), is plainly distinguishable. In *Berman*, the Court found no constructive notice because "[t]he text disclosing the existence of the terms and conditions on these websites is the antithesis of conspicuous. It is printed in a tiny gray font considerably smaller than the font used in the surrounding website elements, and indeed in a font so small that it is barely legible to the naked eye." *Id.* at 856–57. In contrast, here the hyperlink to the blog post was in blue font, which differed from all other text, was not smaller than the font used in the surrounding website elements, and was not barely legible to the naked eye. *See* Scolari Decl. I, Ex. 10. Courts have repeatedly found constructive notice on facts similar to these. *See, e.g.*, *Slaviero*, 2026 WL 1097746, at *4.

Moreover, Plaintiffs seemingly concede that if the X Terms of Service the FSC Plaintiffs agreed to when signing up for X included a so-called "continuing use provision," then their continued use of the platform would clearly manifest assent. *See* Opp. at 8–9. They also fail to mention that both Versions 4 and 19 of the X Terms of Service, which South Carolina Doe and Ohio Doe, respectively, agreed to when joining X (Scolari Decl. II ¶¶ 12, 15), contain just such a continuing use provision (*id*., Exs. 14, 15 ("By continuing to access or use the Services after those revisions become effective, you agree to be bound by the revised Terms.")). And Version 1, which New Jersey Doe agreed to when joining X (*id.* ¶ 9), contains a provision stating that, "[X] reserve[s] the right to alter these Terms of Use at any time." *Id*., Ex. 13. Though, as Plaintiffs point out (*see*

Opp. at 9), the language in Version 1 is not as explicit as the continuing use provisions in Versions 4 and 19, to find X's updates to Version 1 ineffective risks an absurd result—i.e., despite more than seventeen years on the X platform and receiving notice of twenty subsequent updates to the X Terms of Service (and, as described above, acknowledging such notice of, at least, Versions 20 and 21), New Jersey Doe's use of X would still be governed by Version 1. That cannot be so. Because the FSC Plaintiffs received notice of the updated X Terms of Service, were informed of the impact of their continued use, and nevertheless, continued to use the X platform, the FSC Plaintiffs all manifested assent to Version 21 of the X Terms of Service.

### C.  Version 21 of the X Terms of Service Governs this Dispute

In an attempt to avoid language in Version 21 extending the forum-selection clause therein to X Corp.'s U.S. corporate affiliates—e.g., the X.AI Defendants—Plaintiffs argue that Version 21 may not apply "retroactively," and thus Version 20 governs this dispute. Opp. at 10–11. This argument ignores both the timeline of events and plain language of the X Terms of Service.

The timeline is important: Plaintiffs' alleged claims "arose between January 1 and 5, 2026" (*id.* at 10); Version 21 of the X Terms of Service went into effect on January 15, 2026 (*id.*); and Plaintiffs filed their Original Complaint on January 23, 2026 and their Amended Complaint on May 1, 2026. Accordingly, the FSC Plaintiffs each agreed—as described above, through valid notice and assent—to Version 21 *before* filing the Original Complaint. Defendants are not attempting to retroactively enforce a change made to Version 20; rather, Defendants are enforcing Version 21 prospectively. *See, e.g.*, *State Farm Gen. Ins. Co.* v. *Watts Regul. Co.*, 17 Cal. App. 5th 1093, 1100–01 (2017) (applying new agreement because it was made "effective on a future date and with advance notice to the parties, both of whom were free to withdraw from the agreement").

Version 21 explicitly states that: "[T]he choice of law and forum selection provisions of this paragraph . . . *shall apply to your dispute regardless of when the conduct relating to the dispute arose or occurred*." Scolari Decl. I, Ex. 2 § 6. Multiple courts in this District have rejected Plaintiffs' same "retroactivity" argument where—as is true here—the terms state that they apply to previously accrued claims. *See Trudeau* v. *Google LLC*, 349 F. Supp. 3d 869, 878 (N.D. Cal. 2018), *aff'd*, 816

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

F. App'x 68 (9th Cir. 2020) ("That the scope of Section 13(A) covers claims that accrued prior to enactment does not mean that the Section itself has retroactive application."); *Azeveda* v. *Comcast Cable Commc'ns LLC*, 2019 WL 5102607, at \*6 (N.D. Cal. Oct. 11, 2019) ("[B]y its plain terms, the 2015 Program applies to claims accrued prior to its enactment and covers the claims asserted herein."). Version 21 applies to this dispute under the plain and clear language of that provision.

### D.  Defendants Are Intended Third-Party Beneficiaries of X's Terms of Service

The forum-selection clause in Version 21 of the X Terms of Service unambiguously "extend[s] to disputes involving [X Corp.'s] *U.S. corporate affiliates*, who are intended third-party beneficiaries of this paragraph." Scolari Decl. I, Ex. 2 § 6. Plaintiffs nevertheless attempt to sow confusion, arguing that—even though the X.AI Defendants and X Corp. have common ownership (Scolari Decl. I ¶ 40)—the X.AI Defendants are not "corporate affiliates" within the meaning of the X Terms of Service. Opp. at 11–13. This argument fails as a matter of contractual interpretation.

First, the term "corporate affiliates" is not defined anywhere in the X Terms of Service. *Fuentes* v. *Empire Nissan, Inc.*, 19 Cal. 5th 93, 108 (2026) ("[W]ords of a contract are generally to be understood in their ordinary and popular sense."). In claiming otherwise, Plaintiffs' Opposition mistakenly refers to the definition of the term "other covered services," which is in blue font and defined via a hyperlink in the introductory paragraph to the X Terms of Service. Scolari Decl. II ¶ 28. If one clicks on that hyperlink, the resulting webpage references services provided by two corporate affiliates: Vine and Twitpic. Opp. at 11–12. This, however, is not an exhaustive list of X Corp.'s corporate affiliates; rather, it is a list of certain of X Corp.'s corporate affiliates *that provide "other covered services."* And by using the word "including" in the sentence at issue, the X Terms of Service make clear that the "other covered services" are merely a subset of the overall services provided by X Corp. and its corporate affiliates: "These Terms of Service . . . govern your relationship with . . . our or our corporate affiliates' services, *including* . . . our other covered services." Scolari Decl. II ¶ 28; *see Flanagan* v. *Flanagan*, 27 Cal. 4th 766, 774 (2002) ("'Includes' is ordinarily a term of enlargement rather than limitation.").

The only court to have considered this precise issue expressly rejected Plaintiffs' reading of

the X Terms of Service. *See St. Clair* v. *X.AI Holdings Corp.*, 2026 WL 1803744, at *4 n.2 (S.D.N.Y. June 23, 2026). The *St. Clair* court found "unavailing" Plaintiffs' argument here—i.e., "the language 'other covered services' is hyperlinked to a webpage on X titled 'X Services and Corporate Affiliates,'" and "because only Vine and Twitpic are listed on that webpage, no other companies such as X.AI should be considered corporate affiliates." *Id.* The court held that the X.AI Defendants were "corporate affiliates" because "X.AI Holdings Corp. is the direct parent entity of Defendant X.AI Corp and the indirect parent entity of both X Corp. and Defendant X.AI LLC." *Id.* at *5.

Second, the "X Entities" are broadly defined to include: "X Corp., its parents, affiliates, related companies, officers, directors, employees, agents, representatives, partners, and licensors." Opp. at 11. Plaintiffs' claim that the X.AI Defendants' reading of the X Terms of Service would render the term "X Entities" surplusage (*id.* at 12) makes no sense. X Corp.'s "U.S. corporate affiliates" are obviously only a limited subset of the "X Entities" and X Corp.'s global "affiliates."

### E.  The X Terms of Service Are Not Unconscionable

"Under California law, an agreement is enforceable unless it is both procedurally and substantively unconscionable." *Davis* v. *Experian Info. Sols., Inc.*, 2025 WL 2998157, at *4 (N.D. Cal. Oct. 24, 2025) (applying a "sliding scale" analysis). Here, Plaintiffs fail to show that the X Terms of Service are unconscionable in any way. And "courts have generally found forum selection clauses in similar agreements enforceable despite objections of unconscionability." *Trupia* v. *X Corp.*, 2026 WL 381823, at *1 (N.D. Cal. Feb. 11, 2026).

#### 1.  The X Terms of Service Are Not Procedurally Unconscionable

Plaintiffs' three theories of procedural unconscionability all lack merit. Opp. at 14–15. First, though the X Terms of Service constitute a contract of adhesion, courts have routinely upheld such contracts in the context of the internet where, as here, services are offered for free and users have other options for the service at issue. *See, e.g.*, *Cordero* v. *Coinbase, Inc.*, 2025 WL 2223495, at *7 (N.D. Cal. Aug. 5, 2025) (users had "the option to close their account and transfer their cryptocurrency elsewhere"); *Ray* v. *Google LLC*, 2023 WL 7305048, at *8 (N.D. Cal. Nov. 6, 2023), *aff'd*, 2025 WL 2058822 (9th Cir. July 23, 2025) (rejecting unconscionability argument because

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN
DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

YouTube is free and plaintiff could "take [his] [business] elsewhere").

Second, the X Terms of Service are neither prolix nor difficult to decipher. The U.S. terms of service in Version 21 are only ten pages long and consist of six organized sections with subheadings. *See* Scolari Decl. I, Ex. 2; *see also Cohen* v. *CBR Sys., Inc.*, 625 F. Supp. 3d 997, 1003 (N.D. Cal. 2022) (rejecting similar argument where contract was eleven pages long). And while Plaintiffs argue that "surprise" is present because the forum-selection clause is "hidden" "at the end of a long agreement" in the X Terms of Service (Opp. at 14–15), they ignore the fact that Plaintiffs here were directed to a hyperlinked blog post that summarized the changes to the forum selection provisions in a clear, easy-to-understand, bullet point format. Scolari Decl. I, Ex. 9.

Third, Plaintiffs' claim that "surprise and oppression are [] present" because the X Terms of Service are "affirmatively misleading" (Opp. at 15) is simply untrue. Plaintiffs argue that the terms are misleading because they say, "These terms are an agreement between you and X Corp." in one place and later in the same paragraph indicate that X's U.S. corporate affiliates are covered by the forum-selection clause as an "intended third-party beneficiary." *Id.* at 15. But there is nothing misleading about those terms. That a subsequent sentence in the same paragraph of the X Terms of Service expands the scope *of the forum-selection clause* to X Corp.'s U.S. corporate affiliates as an "intended third-party beneficiary" in no way contradicts the first sentence of the paragraph stating that the Terms "are an agreement between you and X Corp." Scolari Decl. I, Ex. 2.

### 2.   X's Terms of Service Are Not Substantively Unconscionable

Plaintiffs' four theories of substantive unconscionability also lack merit. Opp. at 15–18. First, Plaintiffs argue that the X Terms of Service are substantively unconscionable because X Corp. retains the right to make, and has made, unilateral modifications to the governing terms. *Id.* at 15–16. Under the law, however, the right to unilaterally modify a contract is not unconscionable if fair notice is given, as was the case here. *See Hunter* v. *Pre-Paid Legal Servs., Inc.*, 2025 WL 3101978, at *4 (N.D. Cal. Nov. 6, 2025) ("[U]nilateral modification clauses that include reasonable notice restrictions do not render a contract substantively unconscionable.").

Second, Plaintiffs object to the forum-selection clause's lack of "mutuality"—i.e., only

Case No. 5:26-cv-00772-PCP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

plaintiffs must litigate in Texas courts. Opp. at 16. "[C]ourts in this Circuit," however, "have enforced similar one-sided forum selection clauses." *ATSC Melrose, Inc.* v. *IDEXX Distribution, Inc.*, 2026 WL 936937, at *3 (C.D. Cal. Apr. 1, 2026); *see also Great Am. Ins. Co. of NY* v. *Nippon Yusen Kaisha*, 2013 WL 3850675, at *5 (N.D. Cal. May 10, 2013) ("[F]orum selection clauses do not need to provide reciprocal and equal benefits to contracting parties to be enforceable."). In any event, even if Plaintiffs were right about this—and they are not—"the appropriate remedy is to sever the term permitting Defendant greater latitude in selecting a forum" and enforce the rest of the clause. *Garcia* v. *Top Rank, Inc.*, 2014 WL 12791946, at *9 (C.D. Cal. Sept. 9, 2014).

Third, Plaintiffs argue that, because the forum-selection clause sets venue in a specific county, it is unenforceable under Texas state law. Opp. at 16–17. But the enforceability of forum-selection clauses is governed by federal law, not state law. *See Manetti-Farrow, Inc.* v. *Gucci America, Inc.*, 858 F.2d 509, 513 (9th Cir. 1988) (holding that federal law applies to the enforcement of forum clauses, even in diversity cases).[4] And in the Ninth Circuit, forum-selection clauses—even those that specify a venue (*see, e.g.*, *Simonoff* v. *Expedia, Inc.*, 643 F.3d 1202, 1206 (9th Cir. 2011))—are "*prima facie* valid and should not be set aside unless the party challenging enforcement of such a provision can show it is 'unreasonable' under the circumstances." *Argueta* v. *Banco Mexicano, S.A.*, 87 F.3d 320, 325 (9th Cir. 1996). Plaintiffs have made no such showing here.

Fourth, Plaintiffs claim that the combination of the Texas forum-selection clause and Texas governing law provision would permit Defendants to enforce the X Terms of Service's class action waiver provision, which is unconscionable under California law. Opp. at 17–18. But courts have rejected this type of bootstrapping argument—i.e., that forum-selection clauses and governing law provisions must be considered in tandem—where the right at issue is not unwaivable and the transferee venue is a federal court with discretion to apply either forum's laws. *See Run Them Sweet, LLC* v. *CPA Glob. Ltd.*, 2016 WL 6216874, at *3 (N.D. Cal. Oct. 25, 2016) ("After this action is

---

[4] Plaintiffs' argument (Opp. at 4, 13) that *DePuy Synthes Sales, Inc.* v. *Howmedica Osteonics Corp.*, 28 F.4th 956 (9th Cir. 2022), holds that state law governs the validity of forum-selection clauses is incorrect. *DePuy* held only that state law controls in federal court **when deciding if a party's contractual forum-selection clause preempts a state statutory forum-selection mandate**. *Id.* at 965.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

transferred . . . plaintiffs are free to argue to the transferee court that California state law ought to apply."); *E. Bay Women's Health, Inc.* v. *gloStream, Inc.*, 2014 WL 1618382, at *3 (N.D. Cal. Apr. 21, 2014) (same); *Eliza Labs, Inc. v. X Corp.*, 2025 WL 3003766, at *6 (N.D. Cal. Oct. 27, 2025) (forum selection clause is "separate and distinct from choice of law provisions that are not before the court" on a transfer motion). Whether Texas law applies, and whether the class action waiver provision is enforceable, are questions best left for the Northern District of Texas to decide.

### F.  Enforcing the Forum-Selection Clause Does Not Contravene Public Policy

Plaintiffs contend that enforcing the forum-selection clause will result in an impermissible waiver of unwaivable rights under California's Unfair Competition Law ("UCL"). Opp. at 18–19. This is incorrect. Unlike other California statutes, such as the Consumer Legal Remedies Act ("CLRA"), claims under the UCL are not unwaivable, and the loss of such claims does not preclude transfer. *See Run Them Sweet*, 2016 WL 6216874, at *3 ("Plaintiff has not provided the Court with any precedential support for the proposition that its UCL claims are subject to an anti-waiver provision precluding transfer."); *Compound Sols., Inc.* v. *CoreFX Ingredients, LLC*, 2020 WL 3639663, at *5 (S.D. Cal. July 6, 2020) ("[T]here is no anti-waiver clause in the UCL or FAL, as is contained in the CLRA, that could be violated by enforcing the Forum Selection Clause."); *Eliza Labs,* 2025 WL 3003766, at *6 (transferring UCL claims to N.D. Texas).

Even if Plaintiffs' right to injunctive relief under the UCL were unwaivable, transfer would still be proper. As explained in *Kabbash* v. *Jewelry Channel, Inc. USA*, "[b]ecause Texas choice-of-law rules state that contractual choice-of-law provisions will not be enforced if doing so would contravene California's fundamental public policy, enforcement of the [forum-selection and choice-of-law clauses] would not foreclose Plaintiffs' non-waivable rights." 2016 WL 9132930, at *4 (C.D. Cal. Feb. 22, 2016) (granting transfer); *see also Howards* v. *Fifth Third Bank*, 2018 WL 7890667, at *4 (C.D. Cal. Dec. 7, 2018) (granting transfer because Ohio court would consider California's public policy). Transferring this case to Texas will not contravene California's public policy.[5]

---

[5] Even if Plaintiffs were correct, the appropriate remedy would be to transfer the bulk of this case, retain the injunction claims, and stay the remaining proceedings pending the outcome in Texas. *See, e.g.*, *Jialu Wu* v. *iTalk Glob. Commc'ns, Inc.*, 2020 WL 8461696, at *9 (C.D. Cal. Oct. 21, 2020).

### G.  Texas Is a Suitable Forum

"Because public-interest factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Trupia*, 2026 WL 381823, at \*1. Plaintiffs have failed to show this is such an unusual case. Throughout the Opposition, Plaintiffs claim, without any evidentiary support, that X.AI has no relation to or presence in the Northern District of Texas. *See, e.g.*, Opp. at 1–3, 5, 16, 20. This assertion is false. X.AI maintains an office in Fort Worth, Texas and has a team of several employees in the greater-Dallas area—including one on the Grok "Safety Team" responsible for reviewing the kinds of images at issue in this case. Scolari Decl. II ¶ 29. And Plaintiffs' conclusory claim that litigating this case in Texas would be "so gravely difficult and inconvenient" falls flat. Opp. at 21. "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient." *Atl. Marine Const. Co.* v. *U.S. Dist. Ct. for W. Dist. of Texas*, 571 U.S. 49, 64 (2013). Plaintiffs have not shown that litigating in Texas would be inconvenient for the parties or the witnesses—all of the FSC Plaintiffs live closer to Texas than California. *See, e.g.*, *Walters* v. *Famous Transports, Inc.*, 488 F. Supp. 3d 930, 938 (N.D. Cal. 2020) (no inconvenience where transferee forum was geographically closer).

### H.  South Carolina Roe's Claims Should Be Transferred As Well

With regard to whether South Carolina Roe should have her claims transferred to the Northern District of Texas, Plaintiffs' Opposition applies the wrong test. Opp. at 22–25. Section 1404(a) provides for two distinct forums in which transfer is proper: where the action "might have been brought" originally or where "all parties have consented" to litigate. 28 U.S.C. § 1404. This case involves the latter—South Carolina Roe consented to litigate in the Northern District of Texas by suing alongside three plaintiffs that she knew were bound by a forum-selection clause. *See Marano Enters. of Kansas* v. *Z-Teca Restaurants, L.P.*, 254 F.3d 753, 758 (8th Cir. 2001) ("As a voluntary plaintiff, he will not now be heard to object to jurisdiction limited to the venue(s) to which his co-plaintiffs agreed."). Both cases in this District to consider this issue have found, on similar facts, that the non-signatory plaintiffs were bound by the forum-selection clause as well. *See* Mot. at 21–22 (citing *Cung Le* v. *Zuffa, LLC*, 108 F. Supp. 3d 768, 775 n.4 (N.D. Cal. 2015); *Bromlow*

v. *D & M Carriers, LLC*, 438 F. Supp. 3d 1021, 1029 (N.D. Cal. 2020)). This case falls squarely within *Bromlow*, and Plaintiffs' attempt to distinguish it fails. *See* Opp. at 25.

Here, over two months before South Carolina Roe joined this litigation, Plaintiffs' counsel was informed that (i) Defendants intended to move to transfer this action, (ii) transfer was premised on the forum-selection clause in the X Terms of Service, and (iii) the X Terms of Service governed because then-Jane Doe's claims related to conduct on the X platform. *See* Mot. at 11–12. South Carolina Roe is "considered to have notice" of facts, such as these, which are "charged upon" her attorneys. *Link* v. *Wabash R. Co.*, 370 U.S. 626, 634 (1962); *Lawson* v. *DoorDash, Inc.*, 2023 WL 2782314, at *3 (N.D. Cal. Jan. 31, 2023). And by joining the Amended Complaint, South Carolina Roe "assumed the risk that [Defendants] would invoke the forum-selection clause and move to transfer this matter to the forum identified therein." *Bromlow*, 438 F. Supp. 3d at 1029.

Plaintiffs' reliance on a related action to anchor South Carolina Roe's claims in this Court is also an insufficient reason to keep her case here. *See* Opp. at 24–25. South Carolina Roe chose to file suit with the other plaintiffs in this case and is bound by that litigation decision. Severing South Carolina Roe's claims would only create duplicative, parallel proceedings, making severance unwarranted. *See, e.g.*, *Gaston* v. *Gottesman*, 2007 WL 1114014, at *3 (N.D. Cal. Apr. 13, 2007) (severance "not warranted" where it leads to "piecemeal litigation and inconsistent results"). Moreover, X.AI has filed a civil complaint against ▮▮▮▮▮▮▮▮▮▮ in the Northern District of Texas in connection with ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. Scolari Decl. II, Ex. 20 ¶ 1. Accordingly, transfer to Texas will serve judicial economy by allowing ▮▮▮▮▮▮▮▮▮▮▮▮▮. *See, e.g.*, *Mitek Sys., Inc.* v. *United Servs. Auto. Ass'n*, 2020 WL 1922635, at *5 (N.D. Cal. Apr. 21, 2020) ("transfer will facilitate at the very least coordination in that district").

## III.    CONCLUSION

This case should be transferred in its entirety to the Northern District of Texas.

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)

Dated: July 15, 2026

/s/ *Adrian Sawyer*
Adrian Sawyer, State Bar No. 203712
SAWYER & LABAR LLP
1700 Montgomery Street, Suite 108
San Francisco, California 94111
Telephone: 415.262.3820
sawyer@sawyerlabar.com

Joel Kurtzberg (*admitted pro hac vice*)
Ivan Torres (*admitted pro hac vice*)
CAHILL GORDON & REINDEL LLP
32 Old Slip
New York, NY 10005
Telephone: 212.701.3120
jkurtzberg@cahill.com
itorres@cahill.com

**Counsel for Defendants**
*X.AI Corp. and X.AI LLC*

16                                Case No. 5:26-cv-00772-PCP

DEFENDANTS' REPLY IN SUPPORT OF MOTION TO TRANSFER THIS ACTION TO THE NORTHERN DISTRICT OF TEXAS PURSUANT TO 28 U.S.C. § 1404(a)